**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**January 2, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

JENNIFER GREEN,

      Plaintiff-Appellant,

  v.

BOARD OF COUNTY
COMMISSIONERS, CANADIAN
COUNTY, STATE OF OKLAHOMA;
BILLIE LINAM in her individual
capacity; GARY E. MILLER in his
individual capacity,

      Defendants-Appellees.

No. 05-6297

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. CIV-04-1121-C)

---

Submitted on the briefs:[*]

Rand C. Eddy, Eddy Law Firm, Oklahoma City, Oklahoma, for
Plaintiff-Appellant.

Jodi S. Casey, Collins, Zorn & Wagner, P.C., Oklahoma City, Oklahoma, for
Defendants-Appellees Board of Commissioners for Canadian County and Billie
Linum.

---

[*]    After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is
therefore ordered submitted without oral argument.

Angela K. Martin, Assistant Attorney General, Oklahoma Attorney General's Office, Oklahoma City, Oklahoma, for Defendant-Appellee Gary E. Miller.

---

Before **BRISCOE**, **McKAY**, and **BRORBY**, Circuit Judges.

---

**McKAY**, Circuit Judge.

---

Jennifer Green appeals the district court's grant of summary judgment to defendants in her employment-related 42 U.S.C. § 1983 and state-law action. We have jurisdiction under 28 U.S.C. § 1291, and we AFFIRM in part and REVERSE in part.

I.

Ms. Green was employed at Canadian County's Juvenile Justice Center as a drug-lab technician and detention officer. Her primary duties were in the drug lab. As part of her job, she performed drug-screening tests, which the Center makes available free of charge to county residents involved with the juvenile courts, child welfare, or substance abuse treatment programs. The individual defendants allegedly have supervisory authority over the Center, Gary E. Miller as a Canadian County Associate District Judge with administrative authority over the Center and Billie Linum as the director of the Center.

Ms. Green became concerned that the Center did not have a confirmation testing policy, and she raised her concerns with her direct supervisor, Bill

-2-

Alexander, and with Judge Miller. Neither appeared responsive to the issue, with Judge Miller allegedly stating that if clients did not like the results, they could go elsewhere to be tested. In the summer of 2003, Ms. Green suspected that a particular drug test had yielded a false positive, as the client repeatedly advised Ms. Green that she was not taking drugs, positive results notwithstanding. Without consulting her supervisors, Ms. Green contacted the manufacturer of the drug-testing equipment with questions about confirmation testing and arranged for a confirmation test by an outside hospital. She also spoke with representatives of the Department of Human Services about the client and the confirmation test and arranged for a case worker to transport the sample to the hospital. The confirmation test indicated that the Center's initial test was a false positive. Ms. Green communicated this information to Mr. Alexander, and soon thereafter the Center adopted a formal confirmation testing policy.

Ms. Green alleges that, after this episode, her supervisors began treating her less favorably. In the fall of 2003, the drug lab was divided into two areas because construction prevented clients from walking through the Center to the drug lab. Instead of having the clients come to the lab area in the rear of the building, employees collected samples in an area at the front of the Center and then transported them to the drug lab. Thus, Ms. Green was required to walk through the detention center, opening and closing seven or eight heavy jail doors each way, to collect samples and bring them to the drug lab. She and

Mr. Alexander proposed two alternatives to save her and other employees having to make this trip. First, instead of walking, clients could drive around the building to the back of the Center (avoiding the construction) and give samples near the testing area, as they did before construction started. Second, the testing machine could be moved to the front of the Center, to the sample-taking area. To Ms. Green's understanding, Ms. Linum rejected the first alternative, and Judge Miller rejected the second.

On February 19, 2004, Ms. Green notified Mr. Alexander that she had injured her shoulder from having to open and close the jail doors so many times every day. She made a worker's compensation claim and was off work, on a medical release, from February 20 through March 24, 2004. While Ms. Green was off work, Ms. Linum, with Judge Miller's knowledge, instructed Mr. Alexander to move her out of the lab and back to a detention officer position and replace her with another employee. The only available shifts for a detention officer, however, were a 3 p.m. to 11 p.m. shift left open by the replacement employee and a floating shift. Ms. Green was not willing to accept these shifts because she needed to care for her children in the evenings. Mr. Alexander knew that Ms. Green would be unwilling to accept those shifts, because Ms. Green previously had been employed by the Center and quit because she could not work a 3 p.m. to 11 p.m. shift.

A few days before Ms. Green was released for work, she spoke with Mr. Alexander and told him that she could not work the proposed shifts because of her family situation. She also wrote two letters to Ms. Linum, with copies to Judge Miller and Mr. Alexander, explaining why she could not work the proposed shifts and asking why they would not implement the accommodations she had proposed. Ultimately, Ms. Green did not show up for the 3-11 shift, and her employment was terminated.

Ms. Green brought suit under § 1983, alleging that the County Commissioners, Judge Miller, and Ms. Linum had retaliated against her for her conduct and speech, in violation of her First Amendment rights. She also asserted claims for retaliatory discharge under the Oklahoma worker's compensation statute, Okla. Stat. tit. 85, §§ 5-7, and for wrongful discharge in violation of Oklahoma public policy. The district court granted summary judgment to defendants on Ms. Green's claims, and she appealed.

II.

We review the district court's grant of summary judgment de novo, applying the same legal standard as the district court. *Montgomery v. City of Ardmore*, 365 F.3d 926, 934-35 (10th Cir. 2004). Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

## A.

Ms. Green first appeals the grant of summary judgment to defendants on her § 1983 claim of retaliation for exercise of her First Amendment rights. The district court held that she had failed to show that her speech was a matter of public concern.

"'[T]he theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected.'" *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968) (quoting *Keyishian v. Bd. of Regents*, 385 U.S. 589, 605-06 (1967)). On the other hand, "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Garcetti v. Ceballos*, 126 S. Ct. 1951, 1958 (2006). "The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. Thus, the initial inquiries for courts in government-employment First Amendment cases are whether a public employee "spoke as a *citizen* on a matter of *public concern*." *Garcetti*, 126 S. Ct. at 1958 (emphasis added); *see Connick v. Myers*, 461 U.S. 138, 147 (1983); *Pickering*, 391 U.S. at 568.

In *Garcetti*, which was decided after the district court's decision in this case, the Court evaluated the First Amendment claims of a deputy district attorney (Ceballos). Believing that a search warrant affidavit contained misrepresentations, Ceballos wrote a memorandum recommending the dismissal of pending charges and then a second memorandum about the matter. *Id.* at 1955-56. He was later transferred from his calendar deputy position to a trial deputy position and assigned to work at another location. *Id.* at 1956. He sued under § 1983, alleging retaliation for his exercise of his First Amendment rights. *Id.* Focusing on the "citizen" prong of the First Amendment analysis, the Court determined that Ceballos "wrote his disposition memo because that is part of what he, as a calendar deputy, was employed to do." *Id.* at 1960. His expression was "pursuant to" his official duties, and thus he was not speaking as a citizen for First Amendment purposes. *Id.* The Court stated, "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id.* It continued:

> Refusing to recognize First Amendment claims based on government employees' work product does not prevent them from participating in public debate. The employees retain the prospect of constitutional protection for their contributions to the civic discourse. This prospect of protection, however, does not invest them with a right to perform their jobs however they see fit.

*Id.* In light of *Garcetti*, the crux of our inquiry in this case is whether Ms. Green's activities in arranging for a confirmation test were pursuant to her duties as a drug lab technician.[1]

In *Garcetti*, the parties did not dispute that the deputy district attorney's memorandum was part of his official duties. Thus, the Court had "no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." 126 S. Ct. at 1961. The Ninth, the Eleventh, and the Seventh Circuits, however, have begun tackling this issue.

In the Ninth Circuit, *Freitag v. Ayers*, 468 F.3d 528 (9th Cir. 2006), involved a prison guard who was the target of inappropriate, sexually explicit inmate behavior. When she submitted disciplinary forms documenting the conduct, prison authorities ignored them or acted too slowly for the inmates to be disciplined. *Id.* at 533. The guard wrote various memoranda and letters complaining of her supervisors' undermining her authority and allowing the

---

[1]    Generally we do not consider new issues on appeal, but we have the discretion to consider new arguments based on "changes in governing law arising during the pendency of the appeal." *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1222 (10th Cir. 1996). *Garcetti* embodies such a change. Because the opinion was issued after briefing in this appeal, we requested the parties to file supplemental briefs regarding the potential impact of *Garcetti*. In their briefs, all the parties assert that the appellate record is sufficient to allow this court to undertake a *Garcetti* analysis, without the need to remand to the district court. We agree, and thus we proceed to the *Garcetti* analysis as part of our de novo review of the district court's judgment.

hostile environment and harassment. *Id.* at 533-34. Later, she filed a discrimination charge with a state agency and wrote two letters to her state senator. *Id.* at 534-35. The senator requested that the California Office of the Inspector General (IG) investigate the situation; the IG's report substantiated the guard's allegations. *Id.* at 535. Subsequently, her employment was terminated, and she brought suit. The Ninth Circuit held that she was acting as a citizen in her communications with her senator and the IG, but under *Garcetti* her internal complaints (with one potential exception, which it left open for the district court to consider) were not protected because they were submitted pursuant to her duties as a correctional officer. *Id.* at 545-46.

In the Eleventh Circuit, *Battle v. Board of Regents*, 468 F.3d 755 (11th Cir. 2006) (per curiam), involved a university employee who reported to university officials improprieties in her supervisor's handling and management of federal financial aid funds. *Id.* at 757. The employee's contract was not renewed, and she sued for retaliation. *Id.* at 758-59. The court noted that the employee admitted "she had a clear employment duty to ensure the accuracy and completeness of student files as well as to report any mismanagement or fraud she encountered in the student financial aid files," and that federal guidelines also required her to report suspected fraud. *Id.* at 761. Consequently, she acted "pursuant to her official employment responsibilities," and her retaliation claim failed under *Garcetti*. *Id.* at 761-62.

Finally, in the Seventh Circuit, *Mills v. City of Evansville*, 452 F.3d 646 (7th Cir. 2006), involved a police sergeant who criticized a proposal to reorganize the department. Her remarks occurred during a gathering of senior police officers following an official meeting to discuss the plans, when she was on duty and in uniform. *Id.* at 647-48. The Seventh Circuit held that the communications were made "in her capacity as a public employee contributing to the formation and execution of official policy," not as a citizen. *Id.* at 648.

As a starting point for our own analysis, we determine what speech and conduct is at issue. The district court determined that the speech at issue was:

> (1) communication with the client regarding how to obtain a confirmation test; (2) communication with the testing equipment manufacturer about a confirmation test; (3) communication with another individual to ensure chain of custody for the sample to be used in the confirmation test; and (4) communication with Defendants regarding the confirmation test's determination of a false positive.

Aplt. App. Vol. 2 at 467. Green argues on appeal that she also set forth other instances of speech that occurred prior to the obtaining of the confirmation test, including voicing concerns to her superiors about the lack of a confirmation policy, and she generally asserts that the district court approached the issue too narrowly. For purposes of our summary judgment review, we construe the record in the light most favorable to Ms. Green, so we evaluate the speech identified by the district court in light of the other instances of speech and conduct upon which

-10-

Ms. Green relies, particularly her conversations with her supervisors prior to the confirmation test incident.

Next, we examine Ms. Green's job description, keeping in mind that inclusion of a job duty in a formal job description "is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Garcetti*, 126 S. Ct. at 1962. The written job description for a Drug Lab Technician provides:

> 1. Individual will collect and test urine samples as per [the equipment manufacturer's] protocal [sic].
> 2. Individual will enter client data on EDMS computer program.
> 3. Individual will calibrate and maintain [the testing] equipment as per manufacturers' instruction.
> 4. Individual will ensure that [the] supply inventory is sufficient to meet operational demands.
> 5. Individual will maintain drug laboratory records to include: client files, invoices, specimen reports, maintenance log of the [testing] machine, load list book, month end report for court, weekly subject report for local agencies.
> 6. Individual will submit reports to [the Department of Human Services] when requested.
> 7. Individual will perform alcohol swabs when requested.
> 8. Individual will relieve frontdesk receptionist one hour a week and perform any other duties that might be directed by the Detention Director and/or Program Coordinators.
> 9. When not performing duties of Drug Lab Technician, individual will assist in Detention as a Detention Officer.

Aplt. App. Vol. 2 at 265. Appellees Linum and the County Commissioners add that Ms. Green's job duties required her to "work closely" with drug lab clients, the equipment manufacturer, and various governmental agencies. *See id.* at 266.

They also state that it was part of her job to tell clients what to do if they did not like the results of the Center's test. *See id.* Vol. 1 at 87; *id.* Vol. 2 at 258.

On the one hand, the speech and conduct at issue can be categorized as activities undertaken in the course of Ms. Green's job. She had the responsibility for collecting samples and testing them, and by extension, making sure the tests were as accurate as possible (including the responsibility for ensuring that the testing machines were calibrated and operating correctly). She also had the responsibility for communicating with clients and with third parties regarding testing. Under this view, by making arrangements for the confirmation test without consulting her supervisors, Ms. Green decided to ignore her supervisors' instructions (that the Center was not required to have a formal confirmation policy, and if clients were dissatisfied, they could have another test done elsewhere), and thereby properly should be subject to discipline.

On the other hand, one could argue that Ms. Green was not a policymaker and her job responsibilities focused on the logistics of taking tests and keeping records, so she was not required to improve the Center's system by advocating for a confirmation policy or obtaining the confirmation test. Under this view, by arranging for the confirmation test to underline the validity of her previously expressed concerns, Ms. Green was not doing the job she was hired to do, but was acting outside her day-to-day job responsibilities for the public good.

Having considered the arguments pro and con, we conclude that this case is more similar to *Garcetti*, *Battle*, *Mills*, and the non-protected activities in *Freitag* than to activities undertaken by employees acting as citizens. Ms. Green was not communicating with newspapers or her legislators or performing some similar activity afforded citizens; rather, even if not explicitly required as part of her day-to-day job responsibilities, her activities stemmed from and were the type of activities that she was paid to do. Particularly, it was part of her job to ensure that the testing machines were working correctly, and it was part of her job to interact with her supervisors, clients, and third parties regarding testing policies and issues. Her disagreement with her supervisors' evaluation of the need for a formal testing policy, and her unauthorized obtaining of the confirmation test to prove her point, inescapably invoke *Garcetti*'s admonishment that government employee's First Amendment rights do "not invest them with a right to perform their jobs however they see fit." 126 S. Ct. at 1960.

The *Garcetti* Court sought to avoid "judicial oversight of communications between and among government employees and their superiors in the course of official business" and "displacement of managerial discretion by judicial supervision." *Id.* at 1961. Ms. Green's conduct is inextricably intertwined with these types of concerns. Further, *Garcetti* speaks in terms of "official communications" that may cause consequences for government, and notes that "[s]upervisors must ensure that their employees' official communications are

accurate, demonstrate sound judgment, and promote the employer's mission." *Id.* at 1960. Ms. Green's communications with third parties about confirmation testing are the types of communications that would be attributable to the Center. Thus, the Center has an interest in controlling them.

Admittedly, Ms. Green's decision to arrange for the confirmation test apparently succeeded where her previous comments urging adoption of a confirmation policy had failed; after her superiors were faced with the false positive, they adopted a formal confirmation policy. But *Garcetti*, *Battle*, *Freitag*, and *Mills* also involved employees trying to focus attention on apparently misguided actions or improper situations. Nonetheless, their conduct was not protectable under the First Amendment. As stated in *Battle*:

> Although the Court acknowledged that "[e]xposing governmental inefficiency and misconduct is a matter of considerable significance," the Court concluded the public interest was protected by other means, including a "powerful network of legislative enactments – such as whistle-blower protection laws and labor codes" – not by permitting First Amendment retaliation claims based on "expressions employees make pursuant to their professional duties."

468 F.3d at 761 (quoting *Garcetti*, 126 S. Ct. at 1962).

For these reasons, we conclude that, in connection with the unauthorized confirmation test, Ms. Green did not speak or act in her capacity as a citizen, but as a government employee. In light of this decision, we need not consider the district court's holding that the issue was not a matter of public concern. We

affirm the district court's grant of summary judgment to defendants on

Ms. Green's § 1983 claim.

B.

Ms. Green also brought against the Board of County Commissioners a

state-law claim of retaliation for making a worker's compensation claim.[2] The

district court held that Ms. Green's case was most analogous to *Large v. Acme*

*Engineering & Manufacturing Corp.*, 790 P.2d 1086, 1089 (Okla. 1990), in which

the Oklahoma Supreme Court held that a worker who was transferred to another

position could not state a claim for retaliatory constructive discharge. The district

court concluded that the evidence showed that Ms. Green was offered a different

position, and that her employment ended only because she refused to return to

work. "Consequently, no reasonable jury could find that Plaintiff's worker's

compensation claim was a significant motivating factor in the termination of her

---

[2]     Commonly, once a federal claim has dropped out of an action, supplemental state-law claims are no longer "supplemental" and thus are dismissed without prejudice. *See Ball v. Renner*, 54 F.3d 664, 669 (10th Cir. 1995). Here the district court chose not to dismiss Ms. Green's two state-law claims, and at this point, it appears that Ms. Green would be barred from bringing the claims in Oklahoma state court. *See Gibson v. City of Tulsa*, 880 P.2d 429, 430 (Okla. Civ. App. 1994) (noting that Oklahoma's savings statute, Okla. Stat. tit. 12, § 100, does not save claims under the Governmental Tort Claims Act, because the time requirements therein are part of the cause of action rather than merely a limitations period); *Ceasar v. City of Tulsa*, 861 P.2d 349, 350-51 (Okla. Civ. App. 1993) (same). Thus, we believe it is in the interest of justice that Ms. Green's state claims continue to be adjudicated in federal court. *See Ball*, 54 F.3d at 669 (noting that "compelling reasons" may justify federal resolution of state-law claims even after the federal claim has been resolved).

employment." Aplt. App. Vol. 2 at 471. Ms. Green contends that the district court misconstrued her retaliation claim, as the evidence supports a finding that the County directly terminated her employment. She further argues that the district court erred as a matter of law in concluding that Oklahoma would not recognize a constructive discharge claim in this situation.

The district court ruled on this claim under a constructive discharge theory. Assuming for purposes of this decision, without deciding, that Ms. Green's claim presents a case of constructive discharge, we conclude that the district court misplaced its reliance on *Large*. It appears that a key factor in *Large* was that the worker's employment had not actually ended. *See Large*, 790 P.2d at 1088 ("It is significant in this case that the trial court was not presented with facts showing an actual cessation of employment."). In contrast, Ms. Green's employment did end with her transfer. Further, under the facts most favorable to her, a factfinder could determine that the termination of her employment was her supervisors' ultimate goal in transferring her, as they actually knew of her need to care for her children at night and that she could not work the proposed shifts.

Importantly, while *Large* declined to recognize a cause of action for constructive discharge "under the facts presented in [that] case," *id.* at 1089, the Oklahoma Supreme Court later recognized the validity of a constructive discharge theory in a worker's compensation retaliation case. *See Wilson v. Hess-Sweitzer & Brant, Inc.*, 864 P.2d 1279, 1284 (Okla. 1993); *see also Buchanan v. Sherrill*,

51 F.3d 227, 229 (10th Cir. 1995) ("Constructive discharge is now a recognized cause of action in Oklahoma, at least when the plaintiff's employment has terminated." (citing *Wilson*, 864 P.2d at 1284)).

In *Wilson*, the plaintiffs were scheduled to testify in a fellow employee's worker's compensation wrongful discharge suit. 864 P.2d at 1280. The plaintiffs' working hours were then reduced or stopped, so that they were forced to look for other jobs. *Id.* The trial court instructed on constructive discharge as being included in the term "discharge," and the Oklahoma Supreme Court found no error, "because in the case at bar, the employment of the plaintiffs was terminated, unlike the situation in *Large*." *Id.* at 1280, 1284. "Whether the plaintiffs' employment was terminated by the employer and, if so, whether it was in retaliation for their upcoming testimony, were questions of fact for the jury." *Id.* at 1284.

We find the facts alleged here to be more akin to *Wilson* than *Large*. Like the *Wilson* plaintiffs, Ms. Green alleges that her employer deliberately left her with no work she was able to do because of her worker's compensation claim, and her employment then ended. Thus, without expressing any opinion on the proper resolution of this claim, we reverse the grant of summary judgment to the Board of County Commissioners on this claim and remand for further proceedings consistent with this opinion.

C.

Finally, Ms. Green appeals the district court's grant of summary judgment to the Board of County Commissioners on her state-law tort claim of wrongful discharge in violation of public policy. This claim is referred to as a *Burk* claim, as the Oklahoma Supreme Court first recognized it in *Burk v. K-Mart Corp.*, 770 P.2d 24, 29 (Okla. 1989). The district court held that *Burk* claims are only available to plaintiffs without other remedies, and Ms. Green had an adequate federal remedy. Ms. Green argues that Oklahoma has limited the availability of a *Burk* claim only in cases arising from the plaintiff's *status* (such as gender or age), not the plaintiff's *actions*.

In *Burk*, the Oklahoma Supreme Court held that an employee states a valid tort claim where he or she "is discharged for refusing to act in violation of an established and well-defined public policy or for performing an act consistent with a clear and compelling public policy." 770 P.2d at 29. The *Burk* public policy exception, however, is narrow. In *List v. Anchor Paint Manufacturing Co.*, 910 P.2d 1011, 1014-15 (Okla. 1996), the court held that the *Burk* tort was not available to a plaintiff who has an adequate statutory remedy. As the court later stated, "[w]hen a statutory remedy adequately accomplishes the goal of protecting Oklahoma public policy, a common law remedy is not needed." *Clinton v. State ex rel. Logan County Election Bd.*, 29 P.3d 543, 546 (Okla. 2001).

It appears, though, that in cases denying a *Burk* claim on the basis of an adequate statutory remedy, the court's decisions may have rested on the fact that plaintiffs brought status-based claims rather than conduct-based claims. In *List*, the court concluded by stating:

> Mr. List has adequate statutory remedies, and his claim is not based on retaliation for anything that he did. Instead, Mr. List's claim is based solely upon his status, his age. Because Mr. List's statutory remedies are adequate and his common law claim is based solely on his status, his statutory remedies are exclusive.

910 P.2d at 1015. Similarly, in *Marshall v. OK Rental & Leasing, Inc.*, 939 P.2d 1116, 1119 (Okla. 1997), the court held that an employee alleging sexual harassment "has not stated a wrongful discharge claim under *Burk* because she brings this claim based upon her status rather than her conduct." It continued, "[w]e find this matter is governed by *List* . . . , where we found that Oklahoma does not recognize a common law claim for wrongful constructive discharge in violation of public policy where the claim is predicated upon the employee's status rather than conduct." *Id.* at 1120. And in citing other cases regarding discharges in violation of public policy, *Marshall* also stated, "[w]e mention these only to note that each one pertains to actions taken or refused to be taken by the employee. None relate to the employee's status – race, age, gender, etc." *Id.* at 1121 n.2. Finally, in *Clinton*, while the court restated the certified question presented to it by the federal district court, it retained a specific reference to a discharge "based on the employee's status." 29 P.3d at 546.

In matters involving the application of state law, where the state's highest court has not directly spoken on an issue, we determine what decision that court would make were it presented with the issue. *Oliveros v. Mitchell*, 449 F.3d 1091, 1093 (10th Cir. 2006). It is possible that, when faced squarely with the question, the Oklahoma Supreme Court may determine that a plaintiff asserting a conduct-based wrongful discharge claim has no need of a *Burk* claim if he or she already has an adequate statutory remedy. Without further guidance from that court, however, we are unwilling to ignore its specific references distinguishing between status-based and conduct-based claims. In light of these references, it appears that the Oklahoma Supreme Court would allow Ms. Green to pursue a *Burk* claim, as her wrongful discharge allegations are predicated upon her conduct rather than her status. This conclusion is reinforced by *Groce v. Foster*, 880 P.2d 902, 905-06 (Okla. 1994), in which the Oklahoma Supreme Court allowed a plaintiff who alleged retaliation for his actions (refusing to dismiss a negligence action against his employer's customer) to proceed with a *Burk* claim. *See also List*, 910 P.2d at 1015 (pointing to *Groce* as an example of a discharge arising from retaliation for conduct, rather than status).

For these reasons, we hold that the district court erred in granting summary judgment to the Board of County Commissioners on the ground that Ms. Green's *Burk* claim is precluded as a matter of law. Thus, again without expressing any

opinion on the proper resolution of this claim, we remand for further proceedings consistent with this opinion.

III.

The judgment of the district court is AFFIRMED with regard to Ms. Green's § 1983 claim for retaliation in violation of the First Amendment. The judgment is REVERSED with regard to Ms. Green's state-law claims for retaliation in violation of the worker's compensation laws and wrongful discharge in violation of public policy, and those claims are REMANDED for further proceedings consistent with this opinion.