FILED
United States Court of Appeals
Tenth Circuit

February 19, 2010

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

LISA M. ROHRBOUGH,

      Plaintiff-Appellant,

v.

UNIVERSITY OF COLORADO
HOSPITAL AUTHORITY, a body
corporate and political subdivision of
the State of Colorado; and
MARGARET FRUEH, individually
and in her official capacity,

      Defendants-Appellees.

No. 07-1498

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 1:06-CV-00995-REB-MJW)**

David A. Lane, Killmer, Lane & Newman, LLP, Denver, Colorado, for Appellant.

Thomas S. Rice (Gillian M. Fahlsing with him on the brief), Senter Goldfarb &
Rice, L.L.C., Denver, Colorado, for Appellees.

Before **MURPHY**, **EBEL**, and **HARTZ**, Circuit Judges.

**MURPHY**, Circuit Judge.

## I. Introduction

Plaintiff Lisa M. Rohrbough filed suit pursuant to 42 U.S.C. § 1983, alleging her former employer, the University of Colorado Hospital Authority (the "Hospital"), and her former manager, Margaret Frueh, fired her in retaliation for exercising her First Amendment rights. Rohrbough appeals the district court's grant of summary judgment. The district court concluded Rohrbough's speech was unprotected because it was made pursuant to Rohrbough's official duties as a "Transplant Coordinator" in the Hospital's Heart Transplant Unit. Exercising jurisdiction under 28 U.S.C. § 1291, we **AFFIRM**.

## II. Background

Rohrbough worked for the Hospital from November 9, 1992, until June 1, 2004, when the Hospital terminated her employment. During the final five years of her employment, Rohrbough served as the "Transplant Coordinator" in the Hospital's Heart Transplant Unit. In 2002, she became concerned about patient care in the Unit due to what she perceived to be a "staffing crisis." Specifically, Rohrbough believed the staffing problems were affecting the quality of care the Hospital's patients received because labs and other medical tests were performed "extremely late" and charts were not reviewed in a timely fashion. Rohrbough raised her concerns with a number of hospital employees "[b]ecause [she] wanted the patient care issues that were causing patient negative outcomes to be

addressed, and [because she] believed everyone needed to be held accountable for their action or inaction."

First, Rohrbough raised her concerns to Nurses Nancy Ireland and Linda Stepien, and Karin Keller, her day-to-day supervisor. These conversations took place both inside and outside the workplace. She next raised her concerns with Margaret Frueh, her manager, and Dr. JoAnn Lindenfeld, the director of the Hospital's Heart Transplant Unit. Rohrbough also discussed the staffing issues during an appeal of her 2002 performance evaluation with Colleen Goode, vice president of patient services and the Hospital's chief nursing officer, and Joyce Cashman, the Hospital's executive vice president. Still frustrated by the Hospital's lack of response, she took her concerns to Dennis Brimhall, the president of the Hospital. Rohrbough thought it appropriate to meet with Brimhall given that her concerns were "related to [her] employment because they were patient care issues."

Brimhall informed Rohrbough she had the option of meeting with someone from the Hospital's Risk Management Unit. Rohrbough subsequently met with Susan West of the Hospital's Risk Management Unit. West informed her of the Hospital's incident reporting system and welcomed Rohrbough to create incident reports covering the instances of substandard care she observed. Indeed, Hospital policies required all employees to write incident reports whenever they

encountered unsafe conditions, errors, and near misses. After meeting with West, Rohrbough composed eleven such reports.

While her performance evaluation appeal was pending, Rohrbough learned of a possible heart transplant misallocation and cover-up at the Hospital. She reported information regarding this alleged missallocation and cover-up to the United Network for Organ Sharing ("UNOS"), an entity established by Congress to administer organ transplants. As Transplant Coordinator, Rohrbough was responsible for contacting UNOS to place patients on transplant lists, removing patients from transplants lists, and providing information about a particular transplant. In this particular instance, however, Rohrbough testified she called UNOS because her impression was that Dr. Lindenfeld was not going to be truthful in her report to UNOS. She contacted the UNOS representative from her home, identified herself as the Hospital's Transplant Coordinator, and described her basis for believing a heart had been misallocated at the Hospital. She also discussed the alleged heart misallocation with a reporter from the *Denver Westword*, a print weekly.

In February 2004, Rohrbough received a performance evaluation that indicated she had failed to meet Hospital standards. In March 2004, several of Rohrbough's coworkers approached the Hospital's human resources department to express concerns about Rohrbough's poor job performance and her negative impact on the work environment. In response, Rohrbough was placed on

administrative leave. She was reinstated, but failed to improve her performance. As a result, Frueh terminated Rohrbough's employment on June 1, 2004. In explaining her decision to terminate Rohrbough, Frueh testified that "[a]t no time during Ms. Rohrbough's employment at the Hospital did I have knowledge of her reports to UNOS regarding the alleged 'heart-switch cover-up.' . . . Therefore, I could not have disciplined Ms. Rohrbough for this alleged reporting."

Rohrbough filed suit against the Hospital and Frueh, in both her individual and official capacity, alleging the Hospital impermissibly retaliated against her for exercising First Amendment rights. Rohrbough specifically alleges her speech relating to the Hospital's staffing crisis, the heart misallocation, and incident reports were protected under the First Amendment. The Hospital moved for summary judgment, arguing that all of Rohrbough's speech was made pursuant to her official responsibilities and therefore unprotected under *Garcetti*.

The district court entered summary judgment in favor of the Hospital. It held that under the standards developed in the wake of *Garcetti*, it was "clear that all the speech for which plaintiff was allegedly retaliated against [fell] squarely within the scope of her official duties." The district court held Rohrbough's complaints about inadequate staffing "by her own admission, directly related to her concerns about patient safety and welfare" and fell squarely within her "overarching job responsibility as a nurse" to ensure those concerns were met. Similarly, the district court held the occurrence reports were also written pursuant

to Rohrbough's "broader, official duties as a nurse to safeguard patient welfare." Finally, with respect to her communications with UNOS, the district court held this speech was a "natural, foreseeable outgrowth" of Rohrbough's official duty to contact UNOS to place patients on the transplant list or to change a patient's status on that list. As a result, the district court held that none of the speech activities on which Rohrbough's claim was based were "subject to protection under the First Amendment in the wake of *Garcetti*." On appeal, Rohrbough argues the district court erred in determining she spoke pursuant to her official duties as the Hospital's Transplant Coordinator.

## III.  Analysis

### A.  *Standard of Review*

"We review the district court's grant of summary judgment for the [defendants] de novo, applying the same legal standard as the district court." *Shero v. City of Grove, Okla.*, 510 F.3d 1196, 1200 (10th Cir. 2007). Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). "Furthermore, because this case involves the First Amendment, we have an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field

of free expression." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1201 (10th Cir. 2007) (quotation omitted).

### B. Freedom of Speech Retaliation Claim

In *Garcetti v. Ceballos*, the Supreme Court reaffirmed that "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." 547 U.S. 410, 417 (2006). The Court recognized the inherent tension between an employee's right to free speech and the government employer's right to exercise "a significant degree of control over their employees' words and actions," and concluded "while the First Amendment invests public employees with certain rights, it does not empower them to constitutionalize the employee grievance." *Id.* at 418, 420 (quotation omitted).

To balance these competing interests, this court employs the inquiry set out in *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968), and modified by *Garcetti*. *Brammer-Hoelter*, 492 F.3d at 1202. The *Garcetti/Pickering* inquiry comprises five steps:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009).

The first three steps of the *Garcetti/Pickering* analysis are issues of law "to be resolved by the district court, while the last two are ordinarily for the trier of fact." *Brammer-Hoelter*, 492 F.3d at 1203; *see also Thomas v. City of Blanchard*, 548 F.3d 1317, 1322 & 1326 (10th Cir. 2008) (describing step one of the *Garcetti/Pickering* inquiry as a question of whether speech is constitutionally protected and therefore one of law, not fact); *Hesse v. Town of Jackson, Wyo.*, 541 F.3d 1240, 1249 (10th Cir. 2008) ("The determination of whether a public employee speaks pursuant to official duties is a matter of law."). Nevertheless, these cases review disputed facts relevant to step one of the *Garcetti/Pickering* analysis in the light most favorable to the non-moving party at the summary judgment stage. *See, e.g.*, *Brammer-Hoelter*, 492 F.3d at 1204 ("[V]iewing the evidence in the light most favorable to them, Plaintiffs' speech regarding *some* of the matters was not made pursuant to their official duties."); *Hesse*, 541 F.3d at 1249 (viewing the facts in the light most favorable to the Plaintiff to conclude as a matter of law that Plaintiff's speech was made pursuant to his official employment duties); *Green v. Board of County Comm'rs*, 472 F.3d 794, 799 (10th Cir. 2007) (same). Accordingly, this court will view any disputed facts relevant to the issue of whether Rohrbough spoke pursuant to her official duties in the light most favorable to her in making its determination under the first prong of the *Garcetti/Pickering* analysis.

The *Garcetti* Court did not have the opportunity to articulate "a comprehensive framework for defining the scope of an employee's duties," because the parties did not dispute the presence of the factor. 547 U.S. at 424. The Tenth Circuit's decisions addressing the first step of the *Garcetti/Pickering* analysis "have taken a broad view of the meaning of speech that is pursuant to an employee's official duties." *Thomas*, 548 F.3d at 1324 (quotations omitted); *see also Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1331 (10th Cir. 2007) (referring to the first prong of the *Garcetti/Pickering* analysis as a "heavy barrier"). These decisions, however, have not developed a set of bright line rules to determine when an employee speaks pursuant to her official duties for the purposes of *Garcetti/Pickering*. Rather, in line with the Court's admonition in *Garcetti* that "[t]he proper inquiry was a practical one," 547 U.S. at 424, the Tenth Circuit has taken a case-by-case approach, looking both to the content of the speech, as well as the employee's chosen audience, to determine whether the speech is made pursuant to an employee's official duties.

In general, the court has focused on whether the speech activity "stemmed from and [was of] the type . . . that [the employee] was paid to do," *Green*, 472 F.3d at 801, and has highlighted that the ultimate question in determining whether speech falls within an employee's official duties is "whether the employee speaks as a citizen or instead as a government employee," *Brammer-Hoelter*, 492 F.3d at 1203. As examples of protected government employee speech, *Green* listed

"communicating with newspapers or . . . legislators or performing some similar activity afforded citizens." 472 F.3d at 800; *see also Garcetti*, 547 U.S. at 423 (listing "writing a letter to a local newspaper" and "discussing politics with a co-worker" as examples of such speech). The *Garcetti* decision also suggested that a government employee's speech is not protected when there is "no relevant analogue to speech by citizens who are not government employees." *Id.* at 424.

Regarding the content of an employee's speech, the Tenth Circuit has recognized that not all speech "about the subject matter of an employee's work [is] necessarily made pursuant to the employee's official duties." *Brammer-Hoelter*, 492 F.3d at 1204. The court has also noted that speech pursuant to the employee's duty to report a particular activity is usually within that employee's official duties under *Garcetti/Pickering*. *See, e.g.*, *Casey*, 473 F.3d at 1329 (holding that speech made pursuant to an employee's duty to report to her employer regarding the legality of the employer's operations was within the scope of her official duties).

In addition, the court has not foreclosed unauthorized speech or speech "not explicitly required as part of [an employee's] day-to-day job" from being within the scope of that employee's official duties under *Garcetti/Pickering*. *Green*, 472 F.3d at 800-01; *see also Brammer-Hoelter*, 492 F.3d at 1203 (holding that speech could be considered within the scope of an employee's official duty even if "the speech concerns an unusual aspect of an employee's job that is not part of his

everyday functions"). To the contrary, *Green* emphasized the employee's unauthorized speech at issue "inescapably invoke[d] *Garcetti*'s admonishment that [a] government employee's First Amendment rights do 'not invest them with a right to perform their jobs however they see fit.'" 472 F.3d at 801 (quoting *Garcetti*, 547 U.S. at 422). In this vein, *Green* also noted that protecting unauthorized speech would result in "'judicial oversight of communications between and among government employees and their superiors in the course of official business' and 'displacement of managerial discretion by judicial supervision.'" *Id.* (quoting *Garcetti*, 547 U.S. at 423).

Regarding the employee's chosen audience, or chosen method of disseminating speech, the court has similarly refrained from establishing per se rules for determining whether speech is made pursuant to an employee's official duties. For example, in *Brammer-Hoelter*, the speech regarding the budgeting of teacher salaries and staffing levels was not within the scope of the plaintiffs' official duties in part because the speech occurred outside the school, after hours, and with "ordinary citizens and parents." 492 F.3d at 1205. Similarly, the court has observed that speech directed at an individual or entity outside of an employee's chain of command is often outside of an employee's official duties. *See, e.g.*, *Thomas*, 548 F.3d at 1325 (protecting speech based upon the employee's threat to go "outside of his usual chain of command . . . and not merely to his supervisors or to the state housing inspector"); *Casey*, 473 F.3d at 1332-33

-11-

(protecting speech directed to the New Mexico Attorney General because the employee had no responsibility to report to that entity regarding potential violations of the Open Meetings Act).

By contrast, speech directed at an individual or entity within a employee's chain of command is often found to be pursuant to that employee's official duties under *Garcetti/Pickering*. *See, e.g.*, *Casey*, 473 F.3d at 1329-32 (leaving unprotected speech directed at a federal authority due to plaintiff's responsibility to independently report to that authority); *Green*, 472 F.3d at 800-01 (leaving unprotected speech directed at third parties regarding drug testing policies because the plaintiff "had the responsibility for communicating with clients and with third parties regarding testing."). But an employee's decision to go outside of their ordinary chain of command does not necessarily insulate their speech. Rather, as noted above, the proper focus is ultimately still whether the speech "stemmed from and [was of] the type . . . that [the employee] was paid to do," regardless of the exact role of the individual or entity to which the employee has chosen to speak. *Green*, 472 F.3d at 798.

In this case, Rohrbough alleges she was retaliated against because of her communications regarding the Hospital's alleged staffing crisis, the alleged instances of substandard care, and the alleged heart transplant misallocation. Rohrbough's communications with other Hospital employees regarding the alleged staffing crisis, the alleged instances of substandard care, and the alleged

-12-

heart misallocation all fall squarely within the scope of her official duties under the first prong of the *Garcetti/Pickering* analysis.

### 1. The Alleged Staffing Crisis

Rohrbough's communications with other Hospital employees regarding the alleged staffing crisis were made pursuant to her official duties. Her own admissions about why she was concerned about the alleged staffing crisis, as well as other undisputed facts about her job at the Hospital, demonstrate this speech was within the scope of her official duties as Transplant Coordinator in the Hospital's Heart Transplant Unit. Rohrbough admits she had the conversations about the staffing crisis because the staffing crisis affected her ability to do her job and provide appropriate patient care. Furthermore, she directed her speech toward other hospital employees such as Karin Keller, her day-to-day supervisor, Margaret Frueh, her manager, and Dr. Lindenfeld, the director of the Transplant Unit.

Rohrbough correctly points out that a government employee's speech regarding staffing, although work-related, may fall outside the employee's official duties. *See Brammer-Hoelter*, 492 F.3d at 1204-05 (concluding that plaintiffs' speech regarding staffing levels was not made pursuant to their official duties). The speech protected by *Brammer-Hoelter*, however, occurred after hours in groups including ordinary citizens and parents and concerned aspects of school administration over which the plaintiffs had no supervisory responsibility and no

-13-

duty to report. *Id.* at 1205. Unlike the plaintiffs in *Brammer-Hoelter*, however, Rohrbough spoke only to Hospital employees and only about matters within the scope of her duties as a nurse and Transplant Coordinator. *See id.* at 1204 (holding "[n]early all" of the communications at issue were unprotected because they fell within the scope of the plaintiffs' "inherent duty as teachers to ensure they had adequate materials to educate their students"). Thus, Rohrbough's complaints to her coworkers and supervisors about the Hospital's alleged staffing crisis were similarly made pursuant to her official duties under *Garcetti/Pickering*.

### 2. The Occurrence Reports

The undisputed facts also establish that Rohrbough's eleven Occurrence Reports were generated pursuant to her official duties. She wrote these reports at the behest of Susan West of the Hospital's Risk Management Unit. Furthermore, Hospital policies required that all employees, including Rohrbough, create Occurrence Reports to report unsafe conditions, errors, and near misses. Rohrbough's reporting about the conditions affecting her ability to fulfill her duties as Transplant Coordinator at the Hospital undoubtedly was an activity that "stemmed from and [was of] the type . . . that she was paid to do." *Green*, 472 F.3d at 801.

Rohrbough nevertheless argues the communications in these reports were not within the scope of her official duties because drafting them was not

something she was "actually expected to do." Rohrbough relies on *Garcetti*'s focus on "the duties an employee actually is expected to perform," 547 U.S. at 424-25, and notes *Brammer-Hoelter* expressly held that employers may not rely upon generalized grievance policies to characterize "official duties," 492 F.3d at 1204.

These arguments misconceive the thrust of the analysis in Tenth Circuit case law. First, as noted above, employee speech "not explicitly required as part of [an employee's] day-to-day job" may nevertheless fall within the scope of that employee's official duties. *Green*, 472 F.3d at 800-01. Indeed, *Brammer-Hoelter*, the case upon which Rohrbough relies, held that speech could be considered within the scope of an employee's official duty even if "the speech concerns an unusual aspect of an employee's job that is not part of his everyday functions." 492 F.3d at 1203. *Brammer-Hoelter*'s statement that a generalized grievance policy does not free an employer to retaliate against any grieving employee certainly does not also mean that every grievance necessarily falls outside the scope of that employee's official duties. 492 F.3d at 1204. Rather, *Brammer-Hoelter* specifically held that "[n]early all" of the plaintiffs' grievances were unprotected because they were made "pursuant to their duties as teachers." *Id.* at 1204.

Rohrbough's Occurrence Reports were similarly made pursuant to her duties as Transplant Coordinator. Her reports documented the eleven instances of

substandard care she observed while fulfilling her job responsibilities. They detailed several cases in which Rohrbough felt the Heart Transplant Unit's patients had received inadequate care following medication changes, lab results, and other medical tests. Like the teachers' complaints about the school's curriculum and pedagogy in *Brammer-Hoelter*, these reports were all made pursuant to Rohrbough's official duties as Transplant Coordinator within the Hospital's Heart Transplant Unit. Her assertions that her immediate supervisors did not order her to write the reports and that other nurses did not write similar reports does not change the analysis.

### 3. *The Alleged Heart Misallocation*

Finally, Rohrbough's claim that she was retaliated against for her speech regarding the alleged heart misallocation also fails as a matter of law. On appeal, she argues her communications with UNOS, the Colorado State Board of Nursing, and the *Westword* newspaper reporter about the alleged organ misallocation at the Hospital were all protected under the First Amendment. An examination of the record, however, reveals that Rohrbough failed to raise her communications with the Colorado State Board of Nursing and the *Westword* reporter in the district court. Her allegations regarding the "Heart Switch Cover up" appear in paragraphs 18-31 of her complaint. Those paragraphs state that Rohrbough initially directed her concerns to the following individuals: (1) Dr. Ronald Zolty, an attending physician in the Heart Transplant Division; (2) Dr. JoAnn

-16-

Lindenfeld, the Division's director; (3) Karin Keller, Rohrbough's supervisor; (4) Nancy Ireland, a nurse within the Division; (5) Joyce Cashman, the Hospital's executive vice president; and (6) Colleen Goode, the Hospital's vice president of patient services and chief nursing officer.

Due to her continuing concerns about the situation, Rohrbough then alleges she called UNOS and spoke with a representative who was already investigating the incident. Nowhere in her complaint does she allege that she contacted any other individuals or outside entities, or that she was retaliated against for engaging in such speech. In addition, Rohrbough completely failed to raise these issues in her response to the Hospital's motion to dismiss or in her subsequent response to the Hospital's motion for summary judgment. As a consequence, this court will not consider the purported communications with the Colorado State Board of Nursing and the *Westword* reporter as part of the allegedly protected speech. *Walker v. Mather (*In re *Walker)*, 959 F.2d 894, 896 (10th Cir. 1992) (noting this circuit follows the general rule that "a federal appellate court does not consider an issue not passed upon below" (quotation omitted)).

Rohrbough's communications with other Hospital employees regarding the alleged heart misallocation and UNOS cover-up fall within the scope of her official duties. The undisputed facts demonstrate Rohrbough's responsibilities included contacting UNOS to list a patient for an organ transplant and to change a patient's status. Her internal discussions about these duties certainly "stemmed

from and were the type of activities that she was paid to do." *Green*, 472 F.3d at 801. Indeed, Rohrbough testified that Goode, the Hospital's chief nursing officer, told her to "leave [the UNOS] problems with those within the hospital at a level above myself." Rohrbough also testified that Cashman, the Hospital's executive vice president, told her that her "only recourse was to take the problem to Dr. Lindenfeld because she was in charge and was the director of the heart transplant program." Under the undisputed facts, Rohrbough's internal discussions with Dr. Zolty, Dr. Lindenfeld, Keller, Ireland, Cashman, and Goode about the UNOS misallocation fell within the scope of her official duties under *Garcetti/Pickering*.

Rohrbough's additional reporting to UNOS, an outside agency that Rohrbough was nevertheless required to maintain some official contacts with, presents a closer question. This court, however, need not resolve the question of whether this additional reporting fell within the scope of Rohrbough's official duties because her claim cannot survive the fourth prong of the *Garcetti/Pickering* analysis. Step four looks to "whether the protected speech was a motivating factor in the adverse employment action." *Dixon*, 553 F.3d at 1302. Although this step is ordinarily resolved by the trier of fact, *see, e.g.*, *Brammer-Hoelter*, 492 F.3d at 1203, there simply is no evidence in the record from which a trier of fact could reasonably conclude the UNOS speech was a motivating factor in Rohrbough's termination.

Rohrbough's supervisor, Margaret Frueh, testified that she had no knowledge of Rohrbough's UNOS reporting prior to terminating Rohrbough. Specifically, Frueh testified that "[a]t no time during Ms. Rohrbough's employment at the Hospital did I have knowledge of her reports to UNOS regarding the alleged 'heart-switch cover-up.'" Against the weight of this statement, Rohrbough simply argues that she has "presented enough evidence for a reasonable jury to find that her speech was indeed the motivating factor in her termination." Specifically, she contends that Frueh's credibility should be determined by a jury and that discussions regarding the "heart transplant continued through the spring and summer of 2003—just before her September 2003 performance evaluation."

The record certainly supports a conclusion that Rohrbough engaged in a number of discussions with a variety of Hospital employees about the alleged misallocation of the heart. This evidence might allow a jury to infer that Frueh knew of Rohrbough's involvement in the incident. However, there is no evidence whatsoever that Rohrbough told Frueh, or any of her other superiors, of her decision to report the incident to UNOS. Accordingly, she has failed to present sufficient evidence for a reasonable trier of fact to find that her communications with UNOS were a motivating factor in her termination.

**IV.    Conclusion**

For the foregoing reasons, all of Rohrbough's claims fail as a matter of law. Her discussions with other Hospital employees about the alleged staffing crisis, the alleged incidents of sub-standard care, and the alleged heart misallocation were all within the scope of her official duties under the first prong of the *Garcetti/Pickering* analysis.  Furthermore, her reporting of the alleged heart misallocation to UNOS cannot survive the fourth *Garcetti/Pickering* prong because there is no evidence this speech was a motivating factor in Rohrbough's termination.  Finally, this court will not consider Rohrbough's claims based upon her communications with the Colorado State Board of Nursing and the *Westword* reporter because of her failure to present them below.  Accordingly, the district court's grant of summary judgment for the Hospital is **AFFIRMED.**