**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**January 24, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

BARBARA PEREA CASEY and
FRANK CASEY,

      Plaintiffs-Appellees,

v.

WEST LAS VEGAS INDEPENDENT
SCHOOL DISTRICT, and WALTER
ADAMS, AMBROSE CASTELLANO,
PATRICK MARQUEZ, RALPH
GARCIA, MICHAEL VIGIL, and
ARTURO GURULE, in their
individual capacities,

      Defendants-Appellants.

No. 06-2054

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CIV-04-1157 ACT/DJS)**

---

Kevin M. Brown (Daniel J. Macke with him on the briefs), of Brown & German,
Albuquerque, New Mexico, for Defendants-Appellants.

Daniel Yohalem, Santa Fe, New Mexico, for Plaintiffs-Appellees.

---

Before **TACHA,** Chief Judge, **TYMKOVICH,** and **GORSUCH**, Circuit Judges.

---

**GORSUCH**, Circuit Judge.

Barbara Casey, a longtime New Mexico public servant, seeks damages from the West Las Vegas Independent School District and various of its officials, alleging that they demoted and eventually fired her in retaliation for exercising her First Amendment rights. Having moved unsuccessfully for summary judgment in the district court, defendants appeal to us. While this case awaited oral argument, the Supreme Court issued *Garcetti v. Ceballos*, __ U.S. __, 126 S. Ct. 1951 (2006), which profoundly alters how courts review First Amendment retaliation claims. Ms. Casey now concedes that a portion of one claim is barred by *Garcetti*. We agree and find certain other portions also precluded by the Supreme Court's recent ruling. Still, we find that at least one aspect of one of Ms. Casey's claims survives to trial.

I

A former New Mexico state legislator and school teacher, Ms. Casey served as Superintendent of the West Las Vegas Independent School District ("District") from January 2002 until April 2003. Viewing the facts in the light most favorable to her as the party opposing summary judgment, she fairly establishes the following:

Upon becoming Superintendent, Ms. Casey assumed responsibility for serving as the Chief Executive Officer ("CEO") of the District's Head Start program, a federally funded initiative aimed at providing educational opportunities, meals, and health care services to low-income children between

three and five years of age. The District's Head Start program traditionally received approximately $2.5 million annually from the federal government, but prior to the 2001-02 school year, federal authorities determined that the District's Head Start program had 61 major deficiencies and threatened to suspend its funding. Appellants' App. at 131 ¶ 5.

To help address these problems, in June 2002, the District hired Jacqueline Padilla (at Ms. Casey's recommendation) to manage the Head Start program. Ms. Padilla became the District's Head Start director, reported to Ms. Casey, and made a number of changes aimed at bringing the District's program into compliance with federal regulations and ensuring its continued funding. *Id*. at 131 ¶ 6. By the winter of 2002-03, a federal oversight agency determined that the District's program had indeed achieved substantial compliance with federal mandates. *Id*.

Sometime during the period December 2002 - January 2003, Ms. Padilla informed Ms. Casey that her staff had begun to uncover evidence that as many as 50% of the families enrolled in the District's Head Start program appeared to have incomes that were too high for them to qualify for participation. Ms. Casey learned that some families had intentionally omitted family income information or inflated the size of their family in order to enroll their children in the program. Worried that these problems threatened the District's progress and risked its future funding, Ms. Casey reported them to Walter Adams, the West Las Vegas

School Board's ("Board") president and one of the defendants before us. Mr. Adams allegedly responded that Ms. Casey should not worry about the issue. Several more times between January and April 2003, Ms. Casey raised the issue with Mr. Adams and, in executive sessions of the Board, the other individual defendants. Each time, she was told variously not to worry about it, to leave it alone, or not to go there. *See id*. at 55 [51:20-51:24], 59 [60:12-60:21].

Ms. Casey became concerned that, given the Board's inaction, "she had a duty as Head Start's executive director to report this wrong doing [sic] to federal authorities." *See* Appellees' Br. at 5, 39; *see also* Appellants' App. at 138 [51:25-52:3]. Ms. Casey thus instructed her subordinate, Ms. Padilla, to approach the federal Head Start regional office in Dallas and relay her findings. This Ms. Padilla did. Eventually, on August 8, 2003, the United States Department of Health & Human Services ("HHS") determined that certain enrollments in the District's Head Start program were indeed improper and ordered the repayment of more than half a million dollars in federal aid.

During the 2002-03 school year, Ms. Casey also informed the Board that it was violating the New Mexico Open Meetings Act by making personnel and other decisions in executive session without proper notice and meeting agendas. Because defendants apparently ignored her warnings, on approximately March 17, 2003, Ms. Casey filed a written complaint with the New Mexico Attorney General's office. On March 25, 2003, the Attorney General's office wrote to Mr.

Adams outlining the particulars of Ms. Casey's complaint, enclosing a copy of the complaint, and requesting a response. After receiving the Board's response and completing its review of the matter, the Attorney General's office determined that the Board had in fact violated the Open Meetings Act and ordered corrective action.

Finally, Ms. Casey brought to the Board's attention a number of other issues during the 2002-03 school year regarding the District's operations that, she believed, violated federal or state laws. These included, by way of example, an allegation that the District hired employees without advertising vacancies or conducting a review process, and that it improperly handled a case where a teacher and school principal were carrying on an affair.

On April 10, 2003, the Board demoted Ms. Casey to Assistant Superintendent. While there is some lack of clarity regarding exactly when the school board further decided not to renew Ms. Casey's contract for the 2003-04 school year, the facts before us suggest that this may have occurred as early as April 10 or as late as May 8, 2003. *See* Appellants' App. at 130-31 ¶ 3 ("I was demoted by Defendants to the position of Associate Superintendent on April 10, 2003. On May 8, 2003 Defendants voted not to renew my contract of employment for any position in the school district."); *id*. at 73 (Minutes, Regular Board Meeting, April 10, 2003) (Board unanimously voted "not to renew the employment contract with Barbara Casey as Superintendent" and "to immediately

reassign Ms. Casey from her present position to the position of Assistant Superintendent through the remainder of the fiscal year"); *id.* at 174 (letter from Superintendent Arturo Gurule to Ms. Casey) ("I regret to inform you that on [sic] the May 8, 2003 West Las Vegas [School District] board meeting, you[r] employment contract for the 2003-2004 school year was not renewed.").

Following her termination, Ms. Casey filed an action against the District, the new Superintendent, and individual members of the Board alleging, *inter alia*, that she was dismissed in retaliation for exercising her First Amendment rights. The defendants unsuccessfully sought summary judgment in the District Court with respect to Ms. Casey's First Amendment claims based on qualified immunity and now pursue this appeal raising the same defense.[1] Immediately prior to Appellants' submission of their reply brief, the Supreme Court handed down *Garcetti* and, accordingly, we sought and received supplemental briefing from the parties to help us in assessing the impact of the Supreme Court's new guidance.

## II

We review the district court's denial of summary judgment *de novo*. *See Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). When a defendant asserts qualified immunity at summary judgment, the responsibility shifts to the plaintiff to meet a "heavy two-part burden," *id.* (internal quotation marks omitted),

---

[1] This Court has jurisdiction over this interlocutory appeal of a denial of summary judgment because it involves the assertion of qualified immunity. *See Blossom v. Yarbrough*, 429 F.3d 963, 966 (10th Cir. 2005).

demonstrating, first, that the defendant's actions violated a constitutional or statutory right and, second, that the right at issue was clearly established at the time of the defendant's allegedly unlawful conduct. In assessing whether the right was clearly established, we ask whether the right was sufficiently clear that a reasonable government officer in the defendant's shoes would understand that what he or she did violated that right. If the plaintiff fails to satisfy either part of the two-part inquiry, we must grant the defendant qualified immunity.

In analyzing a public employee's First Amendment retaliation claim, the Supreme Court has instructed that we must first decide whether the speech at issue touches on a matter of public concern and, if so, we must then proceed to ask whether the employee's interest in commenting on the issue "outweighs" the interest of the state as employer. *See Dill v. City of Edmond*, 155 F.3d 1193, 1201 (10th Cir. 1998) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1986) and *Connick v. Myers*, 461 U.S. 138, 146 (1983)). "The problem in any case," the Supreme Court observed, "is to arrive at a balance between the interests of the [employee], as citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. How

exactly we are to "weigh" and "balance" the radically incommensurate interests at stake in *Pickering*'s second prong is a matter of great debate and little certainty.[2]

The Supreme Court last Term in *Garcetti* did revisit *Pickering*'s first prong, however, and added some clarity to the question when a public employee speaks as a citizen rather than as an employee. Specifically, the Court held that when public employees speak "pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti*, 126 S. Ct. at 1960. The rationale for this rule is that "[r]estricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply

---

[2] *See, e.g.*, Rodric B. Schoen, Pickering *Plus Thirty Years: Public Employees and Free Speech*, 30 Tex. Tech. L. Rev. 5, 30-31 (1999) ("When the Supreme Court commands that these [F]irst [A]mendment cases be resolved by balancing competing interests, it is scarcely surprising that reasonable persons will disagree with the ultimate balance struck in specific cases. However, until the Court provides a different methodology, litigants, lawyers, and lower courts cannot avoid the uncertainty constitutional balancing inevitably produces when applied to the 'enormous variety of fact situations' presented in cases where public employees are terminated from government employment for reason of their spoken or written expression. Lacking further guidance from the Supreme Court, the federal courts of appeals have occasionally supplemented the Court's jurisprudence with their own refinements, nuances, emphases, and 'rules' to simplify resolution of public employee-free speech cases"); D. Gordon Smith, Comment, *Beyond "Public Concern": New Free Speech Standards for Public Employees*, 57 U. Chi. L. Rev. 249, 276 (1990) (proposing "objective rules that approximate the results of [*Pickering*] balancing without the indeterminacy and excessive expenditure of judicial resources inherent in balancing"); *see also id.* at 269-76.

reflects the exercise of employer control over what the employer itself has commissioned or created." *Id*.[3] The question for us on *Pickering*'s first prong is thus significantly modified,[4] and we are obliged to ask whether Ms. Casey met her burden by providing evidence that her expressions were made in her capacity as a citizen and not pursuant to her "official duties."[5]

In this case, we are presented with three specific sets of communications that Ms. Casey cites as the bases for her First Amendment retaliation claims, those regarding (i) the Head Start program, (ii) the New Mexico Open Meetings Act, and (iii) miscellaneous other violations of state or federal law (*e.g.*, hiring

---

[3] Indeed, the Supreme Court noted that employers have a "heightened interest[] in controlling speech made by an employee in his or her professional capacity," because supervisors have a need to "ensure that their employee's official communications are accurate, demonstrate sound judgment, and promote the employer's mission." *Garcetti*, 126 S. Ct. at 1960.

[4] *See, e.g.*, Frederick Schauer, *The Supreme Court, 2005 Term – Foreword: The Court's Agenda – and the Nation's*, 120 Harv. L. Rev. 4, 35 (noting that *Garcetti* "established a new rule governing a vast amount of lower court litigation"); *Supreme Court, 2005 Term – Leading Cases*, 120 Harv. L. Rev. 273, 273-83 (2006) (discussing *Garcetti*); *see also* Erwin Chemerinsky, *The Kennedy Court: October Term 2005*, 9 Green Bag 2d 335, 340 (2006) (during the Supreme Court's last Term, "the most significant [First Amendment decision] likely was *Garcetti*").

[5] Besides encouraging lower courts to view the facts from a "practical" perspective, the Court declined to provide guidance on how we are to go about determining the appropriate scope of an employee's official duties: "We thus have no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." *Garcetti*, 126 S. Ct. at 1961.

employees without advertising vacancies or conducting a review process, and improperly handling claims of misconduct by teachers and principals).

*Miscellaneous Violations.* In her brief addressing the impact of *Garcetti*, Ms. Casey thoughtfully concedes that any action based on this category of statements is now barred as a matter of law. As Ms. Casey puts it, these statements fell within the scope of her duties as Superintendent because they were aimed "solely to the School Board" to which she reported and her job admittedly included "advis[ing] Defendants about the lawful and proper way to conduct school business." *See* Appellees' Sur-Reply Brief at 7 n.4. We agree with Ms. Casey and hold these statements no longer actionable after *Garcetti* for both of the reasons she articulates.

*Head Start.* Ms. Casey's statements with respect to the Head Start program themselves are of two types. The first, and the bulk of her comments, involve statements directed to the School Board conveying concern about the District's lack of compliance with federal regulations. In our view, these statements do not form the basis for a colorable First Amendment retaliation claim after *Garcetti* for reasons Ms. Casey has already identified. That is, these comments were directed only to her supervisors and, in each instance, Ms. Casey sought to raise concerns about the legality of the District's operations. As before, because advising her employer on "the lawful and proper way to conduct school business" was admittedly part of her portfolio, we cannot help but conclude that Ms. Casey

made these statements pursuant to her official duties. *See Garcetti*, 126 S. Ct. at 1959-61; *see also Mills v. City of Evansville*, 452 F.3d 646, 647-48 (7th Cir. 2006) (holding that an employee's internal discussions advising superiors about the employing institution's policies are barred as a basis for a First Amendment retaliation claim by *Garcetti*).

One remaining statement about the Head Start program that might give rise to a cause of action concerns Ms. Casey's instruction to Ms. Padilla that the latter should contact federal authorities and convey their mutual concerns about the legality of the District's Head Start operations. Here, Ms. Casey did not advise her employers but instead went very much around them. The question before us is whether, in doing so, Ms. Casey used Ms. Padilla as her agent to engage in protected citizen whistleblowing, or whether Ms. Casey acted pursuant to her official duties in ordering a subordinate to report the District's regulatory noncompliance to federal authorities.

Interestingly, the parties before us both made arguments in their principal briefs filed before *Garcetti* that cut against the result they wish this Court to reach after *Garcetti*. In their principal brief before *Garcetti*, the defendants argued that Ms. Casey acted *ultra vires* and in a disruptive manner by reporting the alleged Head Start violations to the federal office.[6] For her part, Ms. Casey argued in her

---

[6] *See* Appellants' Br. at 18 (arguing that Ms. Casey caused disruption by "remov[ing] herself from her advisory and policymaking role . . . [by advising the
(continued...)

principal brief that she "became concerned that she had *a duty as Head Start's executive director* to report this wrong doing [sic] to federal authorities." Appellees' Br. at 5, 39 (emphasis added). After *Garcetti*, the parties seemed to swap positions to meet their respective litigation objectives. In their reply brief filed after *Garcetti*, defendants point to the ostensibly "undisputed fact that [Ms. Casey's] alleged 'speech' was engaged in as Superintendent or CEO of the Head Start program, not as a citizen." Appellants' Reply Br. at 5-6. Ms. Casey, meanwhile, now asserts that in reporting the Head Start violations she was acting solely in her capacity as a citizen, not as an employee. *See* Appellees' Sur-Reply Br. at 7-8.

The parties, of course, can hardly be blamed for shifting positions in their briefs in response to new pronouncements of law. But the underlying discovery facts cannot be so altered and they seem clear enough to us to establish that Ms. Casey was acting "pursuant to" her official duties. Black's defines the relevant term as meaning "[i]n compliance with; in accordance with." *Black's Law Dictionary* 1272 (8th ed. 2004). And it is undisputed that Ms. Casey was designated by the Board as the CEO and person primarily responsible for the sound administration of the District's Head Start program. In accepting this assignment, Ms. Casey necessarily assumed certain responsibilities, pleasant and

_____

[6](...continued)
outside agencies of the allegedly illegal conduct], without first advising the Board which she served"); *see also id*. at 13-14, 18-20.

- 12 -

unpleasant, and these included acting pursuant to, or in compliance with, certain federal regulations. Rules issued by HHS expressly state that families with children enrolled by Head Start grantees must meet specific income eligibility requirements. *See* 45 C.F.R. § 1305.4 (2002). The regulations also indicate that "[a] grantee's failure to comply with [such eligibility] requirements . . . may result in a denial of refunding or termination." *Id.* at § 1305.10. Further, at the time these events took place, individuals, like Ms. Casey, with knowledge of financial irregularities risked civil and criminal liability by remaining silent in the face of such knowledge.[7] In deposition, Ms. Casey effectively acknowledged these facts, conceding that her responsibilities "as executive director" included a duty to report the District's noncompliance to federal authorities because she "would be held legally responsible for having knowledge of something that was wrong and not reporting that." Appellants' App. at 138 [51:25-52:3].

---

[7] *See, e.g.*, Program Fraud and Civil Remedies Act of 1986, 31 U.S.C. § 3802 (any person who submits or causes to be submitted a claim that the person knows is false is subject to a civil penalty); Criminal False Claims Act, 18 U.S.C. § 287 (any person who presents to an agency a claim with knowledge of its falsity shall be imprisoned and fined). Recently, HHS coalesced the various federal statutes, and its own regulations, aimed at deterring fraud into a comprehensive Grant Policy Statement. *See* U.S. Department of Health & Human Services, HHS Grant Policy Statement, I-7 (Oct. 1, 2006), http://www.acf.hhs.gov/grants/HHS_GPS_Oct_2006.doc (last visited Dec. 26, 2006) ("Anyone who becomes aware of the existence (or apparent existence) of fraud, waste, or abuse related to HHS grants or use of grant funds should report this information to HHS.").

Buttressing the conclusion that Ms. Casey acted in accordance with, if not compelled by, her office, she also stated in sworn testimony that her order to Ms. Padilla was aimed at "fix[ing] the problem before it got worse." *Id.* at 147 [112:18-112:20]. That is, Ms. Casey merely wanted "to get direction from somebody . . . and find out what to do" in reporting the District's irregularities. *Id.* at 141 [65:20-65:21]. None of this suggests *ultra vires* conduct but rather an individual striving diligently to fulfill a federal regulatory obligation directly bearing on her by virtue of the office she held. It is also notable that Ms. Casey acted not on her own in this matter, but thought it sufficiently a part of her job duties to report the District's financial irregularities to HHS that she deemed it appropriate to order a subordinate, Ms. Padilla, to contact Head Start officials; nor did the latter blanch at Ms. Casey's direction or give any other intimation that she thought she or Ms. Casey might be acting beyond the scope of their employment.

While we feel obliged after *Garcetti* to conclude that Ms. Casey's actions were taken pursuant to her official position, we do not mean to suggest that every agent who disregards a principal's instructions not to disclose information is barred from suit by *Garcetti*. To the contrary, we are confronted in this case with a rather narrower and subtler set of facts in which the plaintiff's job, as the chief overseer of Head Start for the District, included the sound administration of federal funds; federal law directed the disclosure of any irregularities in the use of

such funds; the plaintiff conceded that her job duties required her to report to federal authorities; and she acted in a manner consistent with this admission. *See McGee v. Public Water Supply*, 471 F.3d 918, 921 (8th Cir. 2006) (the court rejected plaintiff-supervisor's argument that he acted outside the scope of his job duties by voicing concerns about a project after he was removed from it and after being told by superiors "not to concern himself" with another project because, *inter alia*, "the projects clearly fell within [his] overall supervisory duties"). Similarly, we do not mean to suggest Ms. Casey's speech regarding the Head Start program did not relate to a matter of public concern. Far from it. As we have held many times, speech reporting the illicit or improper activities of a government entity or its agents is obviously a matter of great public import.[8] We simply hold that Ms. Casey's speech, such as it was, is more akin to that of a senior executive acting pursuant to official duties than to that of an ordinary citizen speaking on his or her own time; accordingly, Ms. Casey cannot meet her burden here and avoid the heavy barrier erected by the Supreme Court in *Garcetti* to the satisfaction of *Pickering*'s first prong.

Other cases to emerge after *Garcetti* confirm our conclusion. In *Green v. Board of County Commissioners*, No. 05-6297, __ F.3d __ (10th Cir. 2007), we recently faced a case involving a county drug lab employee who ignored her

---

[8] *See, e.g., Schalk v. Gallemore*, 906 F.2d 491, 495 (10th Cir. 1990); *Considine v. Bd. of County Comm'rs*, 910 F.2d 695, 699-700 (10th Cir. 1990); *Conaway v. Smith*, 853 F.2d 789, 796 (10th Cir. 1988).

supervisors and scheduled confirmatory drug tests when she suspected earlier tests had generated "false positives." *See id*., slip op. at 2-3. Even though her conduct was "not explicitly required as part of her day-to-day job responsibilities," and was condemned by her superiors, we nonetheless held that her First Amendment claim was barred by *Garcetti* because her actions were generally "the type of activities she was paid to do." *Id*. at 13. Much the same can be said here. While Ms. Casey disregarded her superiors' direction to suppress her findings about the Head Start program, her decision to report the District's noncompliance to federal authorities was nonetheless in accordance with (and perhaps even an indispensable part of) her job as the senior official responsible for the sound administration of the federally funded program she administered.

A recent Eleventh Circuit decision, *Battle v. Board of Regents*, 468 F.3d 755 (11th Cir. 2006) (per curiam), further illuminates this point. There, the court held that a relatively low-level university employee who reported improprieties in a supervisor's handling of federal financial aid funds was acting within the scope of her duties because, as a financial aid worker, the plaintiff had a duty under federal guidelines to report any suspected fraud associated with federal financial aid funding. *Id*. at 761-62. It seems to us that the responsibility to deal with

known misconduct can be no less emphatic when the employee at issue is a CEO or Superintendent and similar disclosure obligations exist.[9]

*Open Meetings Act.* Ms. Casey first reported her concerns about the Board's failure to comply with the New Mexico Open Meetings Act to the Board itself; when that proved unavailing, Ms. Casey personally took the issue to the New Mexico Attorney General. *See* Appellants' App. at 133 ¶ 16, 161-63. With respect to Ms. Casey's statements directed to the Board, it seems to us significant that they were made solely to her superiors and Ms. Casey, as Superintendent, had a duty to provide candid advice and counsel to the Board, much as any corporate CEO might to his or her board of directors. This, in our view, suffices to preclude a claim under *Garcetti*. *See Green*, __ F.3d __, slip op. at 13 (dismissing claim under *Garcetti* even though employee's conduct was not required as a part of her job because it was generally of the type of conduct she was paid to do); *Mills*, 452 F.3d at 648 (precluding claim under *Garcetti* where police officer advised senior managers that her immediate superior had made a bad decision, despite the fact that the officer had no duty to make such a report).

---

[9] Ms. Casey also spoke to the FBI about the irregularities in the District's Head Start program sometime in May 2003. *See* Appellants' App. at 146 [111:11-111:18]. But Ms. Casey has failed to meet her burden as the party opposing summary judgment to point us to evidence that this interaction took place prior to the adverse employment actions against her on April 10 or May 8, such that it could give rise to liability on the part of defendants.

The statements made to the New Mexico Attorney General, however, are another kettle of fish. In the first place, Ms. Casey was not seeking to fulfill her responsibility of advising the Board when she went to the Attorney General's office. Just the opposite: she had lost faith that the Board would listen to her advice so she took her grievance elsewhere. Of course, Ms. Casey also took her complaints about the Head Start program to outside authorities. But, very much unlike the administration of the Head Start program that the Board committed to her care and pursuant to which she had independent responsibilities to the federal government, we have no evidence in the summary judgment record before us suggesting that the Board or any other legal authority ever assigned Ms. Casey responsibility for the Board's meeting practices. Rather, the evidence before us suggests that the Board members alone were responsible for making certain their meetings complied with New Mexico law at the time.[10] Accordingly, we conclude that Ms. Casey's conduct fell sufficiently outside the scope of her office to survive even the force of the Supreme Court's decision in *Garcetti*.[11]

_____

[10] *See* Office of the Attorney General, State of New Mexico, Op. No. 90-26, 1990 WL 509596, at *1 (Dec. 20, 1990) (noting that based on the statute in effect until April 4, 2003, local school boards had the sole authority to "adopt regulations pertaining to the administration of all powers or duties of the board," including matters related to the manner in which board meetings were conducted).

[11] Our decision on this score naturally concerns only the summary judgment record before us. Defendants remain free to try to establish at trial that it was within the scope of Ms. Casey's office to file her complaint with the New Mexico Attorney General. We express no opinion, one way or the other, on their

(continued...)

The question still remains whether, at *Pickering*'s second prong, the defendants have amassed evidence that Ms. Casey's activities were sufficiently disruptive to eliminate the First Amendment's protection of her speech. While there is no easy formula for "weighing" an employee's First Amendment speech against an employer's interest in an efficient and disciplined work environment, *see supra* note 2, one of our recent cases, *Weaver v. Chavez*, 458 F.3d 1096 (10th Cir. 2006), provides a useful yardstick for comparison. There we held that a city attorney's pattern of making complaints about alleged patronage hires, going so far as contacting a prospective attorney's prior employer to inquire as to his qualifications, were not protected by the First Amendment because they were disruptive to the morale of the office, as well as to the proper functioning of the hiring process. *See id*. at 1103. By contrast, we have no record evidence suggesting that Ms. Casey's statement to the Attorney General's office threatened any of the work of her office, the morale of the Board, or even the Board's substantive decisions; instead, it sought only compliance with a sunshine law requiring notice and opportunity for public comment.

Even if Ms. Casey had a protected First Amendment right in speaking with the Attorney General's office, defendants suggest it is causally beside the point. As they describe it, the Board acted to demote her and discontinue her

---

[11](...continued)
ability to do so.

employment *prior* to becoming aware of any conversation between Ms. Casey and the New Mexico Attorney General's office. It is undisputed, however, that on March 25, 2003 – well *before* Ms. Casey's demotion on April 10, 2003 – the Attorney General's office wrote to Mr. Adams, the Board President, outlining the particulars of Ms. Casey's complaint, enclosing a copy of the complaint, and requesting a response. Defendants respond that they did not receive the letter until April 11, 2003, a single day after Ms. Casey's April 10 demotion. *See* Appellants' App. at 87. But defendants do not explain why it took so long for them to receive the letter and thus leave open the possibility that a jury might not credit their claim. In any event, while it is clear Ms. Casey was demoted in April, the summary judgment record is muddled on the issue whether the Board decided not to reappoint Ms. Casey on April 10 or on May 8. *See supra* pp. 5-6. Accordingly, at least based on the facts in the record now before us, a jury could conclude that Ms. Casey's complaint to the New Mexico Attorney General caused the Board to pursue at least one of the adverse employment actions taken against her.

Finding that Ms. Casey's right to be free from retaliatory employment action based on her protected First Amendment activities was potentially violated, we must still ask whether the right Ms. Casey asserts was clearly established in law such that it put defendants on notice of the impropriety of their alleged retaliation. *See Medina*, 252 F.3d at 1128; *supra* p. 7 (discussing the qualified

immunity doctrine). This we have little difficulty in doing. It has long been established law in this circuit that when a public employee speaks as a citizen on matters of public concern to outside entities despite the absence of any job-related reason to do so, the employer may not take retaliatory action. *See Paradis v. Montrose Mem'l Hosp.*, 157 F.3d 815, 818-19 (10th Cir. 1998) (holding that the law in this area has been clearly established at least since our 1990 decision in *Schalk*); *see also Considine*, 910 F.2d at 700 (establishing, as of 1990, that where an employee communicates "his concerns directly to persons outside the normal chain of command" and the employee's job does not involve doing so, the speech is protected by the First Amendment).[12]

**\*\*\***

The advice Ms. Casey directed to the Board, as her supervisor, is no longer viable as a basis for a First Amendment retaliation claim after *Garcetti*. Ms. Casey's indirect report to federal Head Start officials likewise implicated

---

[12] The district court denied summary judgment on Ms. Casey's First Amendment retaliation claim without differentiating among the various defendants. However, one wrinkle makes that course potentially problematic. Ms. Casey sues not just individuals but also the District itself. In order to state a claim against a government entity under Section 1983, however, a plaintiff must demonstrate the existence of a policy or custom precipitating the plaintiff's injury. *See Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 403-04 (1997) (citing *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694 (1978)). Because the district court apparently has not yet considered whether Ms. Casey's complaint satisfies this requirement with respect to her claim against the District and the issue was not briefed before this Court, we decline to decide the issue at this time, and express no views on the matter, but suggest attention to it on remand.

responsibilities she held by virtue of her administration of a federally funded program and thus cannot supply the basis for a First Amendment claim.  But we find different in character Ms. Casey's statements to the New Mexico Attorney General regarding alleged violations of the Open Meetings Act, violations that she had no apparent duty to cure or report and which were not subject to her control.  We hold that, even after *Garcetti*, a claim based on these statements remains legally viable, and we remand the matter for further proceedings consistent with this opinion.  SO ORDERED.