**Juan HONG, Plaintiff,**

v.

**Stanley GRANT, Chairperson of the Department of Chemical Engineering and Materials Science, et al., Defendants.**

**Case No. SACV 06–0134 CJC (RNBx).**

United States District Court,
C.D. California,
Southern Division.

Sept. 19, 2007.

**1160**

Juan Hong, Pro se Plaintiff.

Kari D. Searles and Richard A. Paul, Attorneys, Paul Plevin Sullivan & Connaughton, San Diego, CA, for Defendants.

### ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

CORMAC J. CARNEY, District Judge.

## I. INTRODUCTION

Juan Hong, a professor at the University of California, Irvine ("UCI" or the "University"), brought this § 1983 civil rights action against the Regents of the University of California and six individual UCI officials and administrators (collectively "Defendants"). Mr. Hong contends that his First Amendment right to free speech was violated when he was denied a merit salary increase because of his critical statements regarding the hiring and promotion of other UCI professors as well as the use of lecturers to teach courses at the University. Defendants deny that Mr. Hong's criticisms had anything to do with the decision to deny his merit salary increase and, in any event, contend that his criticisms were not protected speech under the First Amendment. Defendants now

move for summary judgment on Mr. Hong's free speech claim.

■ After considering all the evidence presented by the parties, as well as the arguments of Mr. Hong and counsel for Defendants, the Court GRANTS Defendants' motion for summary judgment. The First Amendment does not constitutionalize every criticism made by a public employee concerning the workplace. If a public employee's speech is made in the course of the employee's job duties and responsibilities, the speech is not protected under the First Amendment. Because all of Mr. Hong's criticisms were made in the course of doing his job as a UCI professor, the speech is not protected from discipline by University administrators. Moreover, Mr. Hong's criticisms pertained to the internal hiring, promotion and staffing practices of UCI and are of very little concern to the public. This Court is not qualified to second guess the wisdom of UCI's practices in this regard and it must allow University administrators wide latitude in managing its affairs if UCI is to accomplish its very important educational and research mission.

## II. STATEMENT OF FACTS [1]

### A. Background

Mr. Hong is a professor in the Department of Chemical Engineering and Materials Science at UCI. He was hired by UCI in 1987 as an assistant professor in the Biomedical Engineering program and was promoted to full professor in the Department of Chemical and Biochemical Engineering and Materials Science in 1993. (Bio. for Acad. Personnel, Def. Exh. 16, p. 78.) The individual defendants hold the following administrative positions: Stanley Grant, Chemical Engineering and Materials Department Chair; William Schmitendorf, Associate Dean of the School of Engineering; Nicolaos Alexopoulos, Dean of the School of Engineering; John Hemminger, Chair of the Academic Senate Council on Academic Personnel; Herbert P. Killackey, Vice Provost for Academic Personnel; and, Michael R. Gottfredsen, Provost and Executive Vice Chancellor of UCI.

UCI is a public research and academic institution located in Irvine, California. As a member of the University of California system, UCI receives public funding from the state of California to support its core mission of teaching, research and public service. (See Pltf. Exh. 24, p. 203.) The University of California system is administered under principles of shared self-governance between the Board of Regents, the system-wide president and the faculty. (See Def. Exh. 8, p. 55.) Participation in UCI's governance is a professional right of the faculty. (See id.) Faculty exercise their right of self-governance though involvement in a wide array of academic, administrative and personnel functions including departmental governance, the approval of course content and manner of instruction, appointment and promotion of faculty, and faculty and student discipline. (Id.)

The faculty advises the administration on academic appointments, promotions and budgets under the auspices of the Academic Senate. (See Def. Exh. 8.) This academic advisory function "plays a crucial role in implementing the shared governance principle adopted by the University of California." [2] (Pltf. Exh. 4, p. 31.) Ac-

---

1. For purposes of his motion, the Court considers the evidence in the light most favorable to the non-moving party, Mr. Hong.

2. In fact, under the General University Policy Regarding Academic Appointees, professors are ethically obligated to accept their share of faculty responsibilities for the governance of their institution. (See Exh. 8, p. 55.)

cordingly, as a member of the UCI faculty, Mr. Hong participates in a peer review process that evaluates faculty members seeking appointment and promotion within his department. (Dep. of Juan Hong ("Hong") 69: 8–15.) A candidate for appointment submits a file to the department chair which is first reviewed at the subcommittee level and is then put to a vote of the full faculty.[3] (Hong 71: 20–24.) Faculty members are charged with "ascertain[ing] the present fitness of each candidate" and may "consider professional integrity as evidenced by the performance of duties." (App't & Promotion Rev. & Appraisal Comm., Def. Exh. 1, p. 9.) Mr. Hong states that it is his obligation and responsibility as a faculty member to meaningfully review a candidate's file and provide candid and honest feedback. (Hong 74: 5–25.) Mr. Hong further states that when voting against a candidate's appointment or promotion, he is expected to submit a brief memorandum of dissent describing the rationale behind his decision. (Hong 81:4–7.)

## B. Critical Statements by Mr. Hong

In 2002, Mr. Hong participated in the mid-career review of Professor Ying Chang.[4] (Hong 135: 16–21.) While Professor Chang's file was under review, Mr. Hong learned of a rumor that Professor Chang failed to disclose a financial conflict of interest when she first sought appointment at UCI in May 2001. (Hong 141: 12–16.) Mr. Hong told faculty members that a $400,000 research grant listed on Professor Chang's resume may not have been a "refereed" (or openly competitive) grant. (Hong 133: 19–22.) Instead, Professor Chang's husband's company allegedly donated $200,000 in equipment, qualifying Professor Chang for a $200,000 matching grant from UC–SMART, a research grant program operated by the University of California, Berkeley. (Hong 143: 2–11.) Mr. Hong believed that if Professor Chang's husband provided the initial $200,000 donation, the total grant of $400,000 was not earned through accepted channels of competition. (Hong 144: 14–20.) In addition to disclosing the rumor at the faculty meeting, Mr. Hong also requested the permission of departmental chair Stanley Grant to further investigate whether Professor Chang properly disclosed the research grant when she was hired.[5] (Email from J. Hong to S. Grant, Def. Exh. 9.) After investigating Professor Chang's disclosure, Mr. Hong emailed Mr. Grant seeking the status of Professor Chang's candidacy, and Mr. Grant replied that Professor Chang had resigned. (Email from S. Grant to J. Hong, Def. Exh. 10.) Despite Professor Chang's resignation, Mr. Hong prepared a letter of dissent to be included in Professor Chang's file and sought to have it forwarded to the office of the Dean of the School of Engineering. (Hong 161: 5–9; Email from J. Hong to S. Grant, Def. Exh. 11.)

In March 2003, after reviewing the Spring Quarter Schedule of Classes, Mr. Hong complained to Mr. Grant that six of the eight Materials Department classes were taught by lecturers rather than by

---

**3.** A candidate's file includes a biographical sketch, a personal advocacy statement and a list of contributions and achievements in the areas of research, teaching and service. (Hong 71: 6–9.)

**4.** A professor undergoes a mid-career review two years in advance of applying for full tenure. The mid-career review considers a can-

didate's teaching, research and service. (Hong 136: 10–13.)

**5.** Mr. Hong states that the authority to investigate a matter such as an alleged conflict of interest is not limited to the departmental chair or other senior administrators; any faculty member may launch an investigation. (Hong 149: 3–14.)

tenured faculty members. (Email from J. Hong to S. Grant, Def. Exh. 12, p. 72.) Mr. Hong was concerned that departmental resources were used to pay lecturers despite the availability of capable, salaried professors. (*Id.*) Mr. Hong also felt it was the department's obligation to its students to staff courses with experienced faculty, rather than younger, transient lecturers. (Hong 181: 17–24.) After investigating, Mr. Grant reported to Mr. Hong that the Dean's office funded all but $3,579 of the lecturer compensation. (Email from J. Hong to S. Grant, Def. Exh. 12, p. 71.) Mr. Grant replied, in part, "I will be working with all of you over the next couple of weeks to prepare a teaching schedule which has, at most, one paid lecturer per degree program." (*Id.* at 70.) Mr. Hong made at least two more requests to Mr. Grant for information about the lecturer assignments, citing "abnormalit[ies]" in staffing. (*Id.* at 71.)

Mr. Hong also participated in the review of Professor Farghalli Mohammed's application for an accelerated merit increase in October 2003.[6] (Hong 193: 12–17.) He voted against Professor Mohammed's application and issued a three page letter of dissent based primarily on two aspects of Professor Mohammed's application. (Hong 195: 19–25, 196: 1–2.) Mr. Hong believed Professor Mohammed improperly included two non-UCI PhD students in his list of doctoral candidates under supervision (Hong 198: 13–23) and that Professor Mohammed improperly listed two academic papers presented at conferences as refereed publications. (Hong 202: 14–15.) In his deposition, Mr. Hong stated that Professor Mohammed's disingenuous presentation of academic credentials raised legitimate concerns about his integrity.

(Hong 201: 22–24.) Mr. Hong raised his concerns at a faculty meeting, believing he was under an obligation to do so as a faculty member. (Hong 199: 1–3.) Professor Mohammed's application was eventually approved and he sent an email to departmental faculty expressing his gratitude for the promotion. (Hong 203: 17–20; Email from J. Hong, Def. Exh. 15, p. 75.) In a reply to all recipients of the message, Mr. Hong charged that Mr. Grant, Vice Provost for Academic Personnel Herbert Killackey and unnamed persons in the Dean's office improperly manipulated Professor Mohammed's review process and that further investigation was warranted. (Email from J. Hong, Def. Exh. 15, p. 75.)

Finally, in May 2004, Mr. Grant announced to the faculty that Dr. Regina Ragan had accepted an informal offer of employment as an Assistant Professor, and that a full vote on her appointment would occur at an upcoming faculty meeting. (Email from S. Grant, Pltf. Exh. 41, p. 1.) Mr. Hong believes that extending an informal offer prior to full faculty approval violates the "faculty right [in the] self governance process" to determine "who can teach, who can do creative research, [and] who can serve in the community and university." (Hong 208: 20–25; 209: 1.) Mr. Hong charged that Mr. Grant and the Engineering School Dean Nicolaos Alexopoulos were responsible for the improper employment offer extended to Dr. Ragan. (Hong 210: 19–20.) In an unidentified communication submitted to the Court by Mr. Hong, he urged Executive Vice Chancellor Michael R. Gottfredsen to investigate Dr. Ragan's hiring, stating that "[p]articipation in the governance of the University including appointment and pro-

---

**6.** A merit increase is a promotion of rank and increase in salary. An accelerated merit increase "occurs when an individual is awarded a merit increase after serving fewer years at a given step than is normal for that salary step, or when an entire step (or more) is skipped." (Acad. Personnel Proc., § 3–40(B), Pltf. Exh. 2, p. 12.)

motion of faculty is professional right of faculty [sic]." (Pltf. Exh. 60, p. 505.)

### C. Mr. Hong is Denied a Merit Increase

Mr. Hong was scheduled for a routine merit increase in 2003 but requested a one year deferral, citing unsatisfactory research performance. (Memo. from J. Hong to N. Alexopoulos, Def. Exh. 13.) In September 2004, he submitted his application for a merit increase. (Hong 212: 8–9.) His self-advocacy statement listed his success in attracting extramural research grants as "zero." (Self Adv. Stmt., Def. Exh. 18.) He described his participation in peer-reviewed publications as "average" and "minimal." (*Id.*) Mr. Hong's application did not list any achievements under "Professional Recognition and Activity," "Honors, Awards, Election," "Contracts, Grants or Fellowships," "Other Professional Service," or under a number of other categories. (Hong 218–220.) In January 2005, the faculty recommended that Mr. Hong be denied a merit increase because his "research activities [were] not at the level commensurate with the rank of Full Professor, Step IV." (Memo. from the Faculty to M. Gottfredsen, Def. Exh. 19, p. 107.)

The results of Mr. Hong's merit increase application were reviewed and evaluated by a number of UCI administrators including Mr. Alexopoulos and Associate Dean William Schmitendorf, (Memo. to M. Gottfredsen, Def. Exh. 24), Chair of the Academic Senate Counsel on Academic Personnel John Hemminger, (Memo. to M. Gottfredsen, Def. Exh. 26), and Mr. Gottfredsen, (Memo. to N. Alexopoulos, Def. Exh. 27). On March 2, 2005, Mr. Gottfredsen notified Mr. Alexopoulos of his disappointment with Mr. Hong's research progress, requested that Mr. Grant embark upon a remediation plan with Mr. Hong, and requested that Mr. Hong be assigned an increased teaching load in light of his decreased scholarly contributions. (Memo. to N. Alexopoulos, Def. Exh. 28.)

One month later, Mr. Hong responded to Mr. Gottfredsen's memorandum and asserted that he was the victim of illegal retaliation for his criticisms of Mr. Grant, Mr. Alexopoulos and other administrators' handling of Professor Chang's mid-career review, assignment of lecturers in Spring 2003, Professor Mohammed's accelerated merit increase, and the hiring of Dr. Ragan. (Memo. from J. Hong to M. Gottfredsen, Def. Exh. 34, p. 148.) After receiving no response from Mr. Gottfredsen, Mr. Hong filed a whistleblower retaliation complaint with Assistant Executive Vice Chancellor Michael Arias on November 1, 2005. (UCI Whistleblower Retaliation Comp. Form of J. Hong, Def. Exh. 34.) The complaint was ultimately rejected because "the merit action was initiated and completed in March 2005, well before the April 2005 whistleblower complaint on April 25, 2005." (Confidential Factfinder Report, Def. Exh. 38, p. 166.) The report further concluded there was ample evidence to support the denial of Mr. Hong's merit increase, an increased teaching load and a proposed change in series from full Professor. (*Id.* at 170–172.)

Mr. Hong filed the instant action *pro se* in the United States District Court for the Central District of California on February 8, 2006 alleging he was the victim of illegal retaliation for exercising his rights under the First Amendment to speak as a citizen on a matter of public concern in violation of 42 U.S.C. § 1983.[7] (Compl. ¶ 41–43.)

---

7. Mr. Hong also refers in his first amended complaint to Article I, section 2 of the California Constitution as a basis for his free speech claim. Mr. Hong, however, seeks no relief under this state provision nor did he mention the provision in his opposition to Defendant's motion.

Defendants moved for summary judgment on the grounds that Mr. Hong's statements were not protected speech under the First Amendment.[8]

## III. ANALYSIS

 Public employees do not enjoy the same First Amendment freedoms as do private citizens. *See e.g., United States v. Nat'l Treasury Employees Union,* 513 U.S. 454, 466, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995); *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). In fact, a government employer may impose speech restrictions upon its employees "that would be plainly unconstitutional if applied to the public at large." *Nat'l Treasury Employees Union,* 513 U.S. at 465, 115 S.Ct. 1003. Such restrictions are necessary to protect "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Bd. of Ed. of Township High Sch. Dist. 205, Will County, Ill.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). The government may set restrictions upon employee speech so long as its need for those restrictions is not outweighed by the interest of the employee in speaking as a private citizen on matters of public concern. *See id.* This balance is struck under "the common sense realization that government offices could not function if every employment decision became a constitutional matter." *Connick,* 461 U.S. at 143, 103 S.Ct. 1684.

 Under the Supreme Court's recent decision in *Garcetti v. Ceballos,* a public employer is extended unfettered discretion to regulate employee speech that it "has commissioned or created." 547 U.S. 410, 126 S.Ct. 1951, 1960, 164 L.Ed.2d 689 (2006). In *Ceballos,* the Supreme Court held that memoranda prepared by a supervising district attorney criticizing inaccuracies in an affidavit used to secure a search warrant were not protected by the First Amendment because they were prepared "pursuant to his official duties," not as a private citizen. *Id.* According to the Court, Mr. Ceballos did not act as a citizen when he executed his professional responsibilities that included writing and speaking critically of his employer's disposition of criminal cases. *Id.* There was no "relevant analogue" between Mr. Ceballos' memoranda and speech activities undertaken by everyday citizens, such as "writing a letter to a local newspaper, or discussing politics with a co-worker." *Id.* (citations omitted). That his duties required him to speak critically of his supervisors did not insulate Mr. Ceballos from their evaluation of his performance. *Id.* The Court reasoned:

> Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created.

*Id.* Allowing anything less than unfettered employer control over speech within an employee's official duties would "displace managerial discretion for judicial supervision," requiring "permanent judicial intervention in the conduct of governmental operations." *Id.* at 1961.[9]

---

**8.** UCI also moved for summary judgment on the grounds that the Eleventh Amendment bars awarding damages against the Regents and Mr. Gottfredsen. As the Court has reached its decision on First Amendment grounds, the merits of UCI's Eleventh Amendment argument need not be addressed.

**9.** The parties in *Ceballos* did not dispute that the memoranda at issue were prepared pursuant to Mr. Ceballos' official duties. The Court's only guidance in assessing whether a particular statement is made pursuant to an official duty was that "[t]he proper inquiry is a practical one." 126 S.Ct. at 1961.

■ An employee's official duties are not narrowly defined, but instead encompass the full range of the employee's professional responsibilities. While an employee's job description is not dispositive of his official duties, *see id.* at 1962, any activity within an "employee's uncontested employment responsibilities" is an official duty, *Brammer–Hoelter v. Twin Peaks Charter Acad.,* 492 F.3d 1192, 1203 (10th Cir.2007). *See also Casey v. W. Las Vegas Indep. Sch. Dist.,* 473 F.3d 1323, 1329 (10th Cir.2007) (activities within an employee's "portfolio" are official duties). An employee's official duties extend to include speech made during actions generally consistent with "the type of activities [the employee] was paid to do." *Green v. Bd. of County Comm'rs,* 472 F.3d 794, 801 (10th Cir.2007). For example, an activity that "reasonably contributes to or facilitates the employee's performance of the official duty" is considered pursuant to the employee's official duties. *Brammer–Hoelter,* 492 F.3d at 1203. Even internal complaints about the employer's supervisory failures or workplace mismanagement are consistent with the type of activities the employee is professionally obligated to perform. *See Ceballos,* 126 S.Ct. at 1960; *Freitag v. Ayers,* 468 F.3d 528, 546 (9th Cir.2006). Taken together, the small number of cases applying *Ceballos* make clear that an employee's official duties are construed broadly to include those activities that an employee undertakes in a professional capacity to further the employer's objectives.

■ For example, in *Freitag v. Ayers,* a female prison guard who was the victim of threatening and sexually hostile inmate conduct filed a number of complaints which were either ignored or acted upon slowly by prison officials. 468 F.3d at 533–34. The guard wrote a number of internal memoranda critical of her supervisors for allowing the hostile work environment. *Id.* at 533. She also filed complaints with two state agencies and wrote letters to her state Senator. *Id.* at 533–34. The Ninth Circuit held that the guard was acting as a citizen when she complained to her state Senator and two independent agencies, but was acting pursuant to her official duties when she lodged internal complaints (with the exception of one memorandum which was remanded for the District Court's consideration). *Id.* at 545–46. While the guard's complaints to external outlets "bore similarities to letters submitted by numerous citizens every day," *id.* at 545 (*quoting Ceballos,* 126 S.Ct. at 1960) (internal quotations omitted), the guard's internal complaints were submitted "pursuant to her official duties as a correctional officer and thus not in her capacity as a citizen." *Id.* at 546. While the guard spoke critically of her supervisors—which was not expressly required of prison guards—her comments were not protected speech because they arose during normal professional responsibilities. *See id.* Consistent with other circuits applying *Ceballos,* the Ninth Circuit has thus adopted an inclusive definition of an employee's official duties, which is not limited by the employee's express or traditional job functions. *See id.*

The dispositive question for purposes of Defendants' motion for summary judgment is whether Mr. Hong's four statements were made "pursuant to his official duties" as a UCI faculty member. *See Ceballos,* 126 S.Ct. at 1960. This first requires an examination of Mr. Hong's professional responsibilities. In the University of California system, a faculty member's official duties are not limited to classroom instruction and professional research. (*See* Def. Exh. 8, p. 55.) While Mr. Hong's professional responsibilities undoubtedly include teaching and research, they also include a wide range of academic, administrative and personnel functions in accordance with UCI's self-governance principle. (*See id.*)

(providing for faculty involvement in departmental governance, the approval of course content and manner of instruction, appointment and promotion of faculty, and faculty and student discipline). As an active participant in his institution's self-governance, Mr. Hong has a professional responsibility to offer feedback, advice and criticism about his department's administration and operation from his perspective as a tenured, experienced professor. (*See id.*) UCI allows for expansive faculty involvement in the interworkings of the University, and it is therefore the professional responsibility of the faculty to exercise that authority.

Given this brief explication of Mr. Hong's official duties as a UCI faculty member, the Court now turns to the four statements that Mr. Hong argues served as the basis for Defendants' allegedly retaliatory employment actions.

■ Mr. Hong first alleges that his criticisms related to Professor Chang's mid-career review are protected speech under the First Amendment. But, as Mr. Hong admitted, these statements were made according to his "uncontested employment responsibilit[y]" to participate in his department's faculty appointment and promotion process. *See Brammer–Hoelter*, 492 F.3d at 1203. In his deposition, Mr. Hong admitted he was professionally obligated to participate in the faculty review process. (Hong 74: 5–25.) He further admitted that he was expected to be honest and candid which necessarily implicates negative feedback and criticism of Professor Chang's application. (*See id.*; Hong 81: 4–7.) Furthermore, Mr. Hong's criticisms were delivered only internally: first to a full faculty meeting and then to Mr. Grant, the department's chairperson. (Email from J. Hong to S. Grant, Def. Exh. 9; Email from S. Grant to J. Hong, Def. Exh. 10.) Finally, the content of Mr. Hong's criticism of Professor Chang's al-

leged conflict of interest raised issue with her academic integrity, a legitimate and authorized criteria for assessing her candidacy. (*See* App't & Promotion Rev. & Appraisal Comm., Def. Exh. 1, p. 9.) Given their context, form and content, Mr. Hong's statements about Professor Chang are not protected speech. *See Ceballos*, 126 S.Ct. at 1960. UCI "commissioned" Mr. Hong's involvement in the peer review process and his participation is therefore part of his official duties as a faculty member. *See id.* The University is free to regulate statements made in the course of that process without judicial interference. *See id.*

■ Next, Mr. Hong alleges that his criticism of the department's use of lecturers to staff Materials Department courses are protected by the First Amendment. These statements, which speak only to internal departmental staffing and administration, are also unprotected speech. *See Ceballos*, 126 S.Ct. at 1960. Mr. Hong is under professional obligation to actively participate in the interworkings and administration of his department, including the approval of course content and manner of instruction. (*See* Def. Exh. 8, p. 55.) His "portfolio" of official duties is not limited to those within the classroom and laboratory, *see Casey*, 473 F.3d at 1329, but extends to commenting on staffing decisions which affect his teaching load as well his colleagues' teaching loads. (*See* Def. Exh. 8, p. 55.) Mr. Hong communicated his criticism over UCI's internal email system to his departmental chair and numerous other faculty members. (*See* Email from J. Hong to S. Grant, Def. Exh. 12, p. 72.) Like the prison guard in *Freitag*, Mr. Hong lodged internal complaints about perceived mismanagement which, in Mr. Hong's case, was discovered during the course of executing his professional responsibility to participate in his depart-

ment's administration and management. *See Freitag*, 468 F.3d at 546. The form, content, and context of Mr. Hong's statements all indicate he was fulfilling a professional obligation and not acting as a private citizen. *See id.* at 545. His criticism of Materials Department staffing therefore cannot be protected speech under the First Amendment.

■ Third, Mr. Hong alleges his criticisms of Professor Mohammed during his consideration for an accelerated merit increase are protected speech. Again, as with Professor Chang, Mr. Hong's comments arose in the course of his professional obligation to participate in the faculty review process. (*See* Hong 74: 5–25.) Mr. Hong's comments were made during a faculty meeting to evaluate Professor Mohammed's application for promotion (Hong 199: 1–3) and over faculty-wide email in response to a message from Professor Mohammed. (Email from J. Hong, Def. Exh. 15, p. 75.) His comments concerned Professor Mohammed's professional integrity, which Mr. Hong was authorized to evaluate under faculty appointment procedures. (*See id.;* App't & Promotion Rev. & Appraisal Comm., Def. Exh. 1, p. 9.) This type of feedback and criticism was "commissioned" by UCI when it established the faculty's integral role in peer evaluations. *See Ceballos*, 126 S.Ct. at 1960. As such, it was within Mr. Hong's official duties as a faculty member and is not protected. *See id.* Mr. Hong's additional statements about administrative manipulation with respect to Professor Mohammed's promotion were also pursuant to his official duties. In an email to Mr. Gottfredsen requesting further investigation into the applications of Professor Chang and Professor Mohammed, Mr. Hong stated: *"As a member of the UCI community, I have a duty to report* to you inequitable conducts [sic] by the Dean and two faculty members." (Email from J. Hong to M. Gottfredsen, Def. Exh. 34, p. 145) (emphasis added).

Internal complaints about supervisory mismanagement are within an employee's official duties and not subject to First Amendment protection. *See Freitag*, 468 F.3d at 546.

■ Finally, Mr. Hong alleges that his statements criticizing Mr, Grant's alleged circumvention of the faculty's role in the hiring process is protected by the First Amendment. These comments, too, were made pursuant to Mr. Hong's official duties because they were the result of his professional obligation to participate in departmental self-governance. Mr. Hong admitted in his deposition that there exists a "faculty right" to participate in decisions related to faculty hiring and promotions. (Hong 208: 20–25; 209: 1.) By seeking to protect his ability to exercise his participatory right, Mr. Hong was "facilitat[ing his] performance of the official duty." *See Brammer–Hoelter*, 492 F.3d at 1203. He raised his criticisms internally to individuals responsible for academic appointments and personnel in a professional capacity, not in his capacity as a private citizen. *See Freitag*, 468 F.3d at 546. As participation in faculty appointments is an official duty of Mr. Hong, his criticisms about that process are necessarily within his official duties as well and cannot be protected speech under the First Amendment. *See Ceballos*, 126 S.Ct. at 1960.

Simply stated, these four statements, which Mr. Hong alleges served as the basis for UCI's illegal retaliation, were made pursuant to his official duties as a faculty member and therefore do not deserve First Amendment protection. *See id.* UCI is entitled to unfettered discretion when it restricts statements an employee makes on the job and according to his professional responsibilities. *See id.* Regulation of this professional speech does not strip Mr. Hong of any liberties he enjoys as a private citizen. *See id.*

 Moreover, the Court has great difficulty in viewing Mr. Hong's comments as a matter of such public concern that protection under the First Amendment is deserved. If employee statements "cannot fairly be considered as relating to any matter of political, social or other concern to the community," the statements are not constitutionally protected speech. *Connick*, 461 U.S. at 146, 103 S.Ct. 1684. While Mr. Hong argues that his statements are of public concern because they exposed government waste and mismanagement, they are more properly characterized as internal administrative disputes which have little or no relevance to the community as a whole. *See id.; Colburn v. Tr. of Ind. Univ.*, 973 F.2d 581, 587 (7th Cir.1992).

For example, in *Colburn v. Trustees of Indiana University*, two sociology professors (the "Professors") at a University of Indiana campus claimed they were denied promotion, reappointment and tenure because of constitutionally protected speech. *Id.* at 582–83. The Professors had joined with two other sociology department faculty members in requesting that the Dean of Faculties investigate the department's "primary committee," the first point of review in the department's appointment and promotion process. *Id.* at 583. The petitioning faculty members claimed the committee was unfairly dominated by a rival group of faculty. *Id.* at 584. After the Dean deferred an investigation, the rival faction maintained control of the primary committee. *Id.* at 584. When the Professors sought reappointment, the primary committee denied their application in part because of their complaints about the review process. *Id.* The Seventh Circuit rejected the Professors' First Amendment claims and held that their complaints about an internal departmental dispute were not a matter of public concern. *Id.* at 586. The Court found that the context, content and form of the Professors' speech more closely resembled "an internal personal dispute," *id.* at 587, devoid of allegations of "illegality or breach of the public trust" that would transform their comments into a matter of public significance. *Id.* at 588. The court stated:

> No doubt the public would be displeased to learn that faculty members at a public university were evaluating their colleagues based on personal biases. Nonetheless, the fact that the issue could be 'interesting' to the community does not make it a matter of public concern.... [The Professors] did not attempt to expose some malfeasance that would directly affect the community at large.

*Id.* at 587. Without public relevance or significance, the Professors' internal departmental complaints were denied First Amendment protection. *See id.*

Mr. Hong's four statements are no different than the internal departmental complaints of the Professors in *Colburn.* Each of Mr. Hong's statements—regarding faculty performance reviews, departmental staffing and faculty hiring—involved only the internal personnel decisions of his department. In no way did they implicate matters of pressing public concern such as malfeasance, corruption or fraud. Mr. Hong nevertheless argues that the public is inherently interested in the University's interworkings because UCI is funded by taxpayers. "To presume that all matters which transpire within a government office are of public concern would mean virtually every remark—and certainly every criticism directed at a public official—would plant the seed of a constitutional case." *Connick*, 461 U.S. at 149, 103 S.Ct. 1684. Such expansive constitutionalization would require endless judicial supervision of the decisions university administrators must make on

a daily basis to ensure the efficient and effective management of their institution. Federal courts are ill-equipped to oversee these purely institutional decisions absent a significant federal interest.[10]

## IV. CONCLUSION

For all of the foregoing reasons, summary judgment is granted in favor of Defendants.

---

**10.** Mr. Hong, however, is not left without recourse. He may resort to the legal system's "powerful network of legislative enactments—such as whistle-blower protection laws and labor codes ..." to address conduct he believes to be retaliatory. *See Ceballos*, 126 S.Ct. at 1962.